# United States Tax Court

T.C. Memo. 2025-6

SEABROOK PROPERTY, LLC, SEABROOK MANAGER, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 5071-21.                    Filed January 21, 2025.

————

*Michelle A. Levin*, *Gregory P. Rhodes*, *Logan C. Abernathy*, *Sarah E. Green*, *Kristin Martin Centeno*, and *Sidney W. Jackson IV*, for petitioner.

*Christopher A. Pavilonis*, *William Benjamin McClendon*, *Peter T. McCary*, *Randall B. Childs*, *Erin A. Schaffer-Williams*, *Hannah Kate Comfort*, *Richard C. Mills III*, and *Patricia M. Zweibel*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

TORO, *Judge*: This syndicated conservation easement case involves a noncash charitable contribution deduction claimed for 2017. Seabrook Property, LLC (Seabrook), claimed a deduction of $32,581,443 for its grant to the Southern Conservation Trust, Inc., of a perpetual conservation easement on approximately 622 acres of real property in Liberty County, Georgia. The claimed deduction was premised on the view that the land over which the easement was granted was worth approximately $58,084 per acre (approximately $100,000 per upland acre) before the granting of the easement.

By Notice of Final Partnership Administrative Adjustment (FPAA), the Commissioner of Internal Revenue disallowed the deduction in full. The Commissioner also determined that Seabrook is

[*2] subject to an accuracy-related penalty under section 6662[1] and a reportable transaction penalty under section 6662A.

After concessions,[2] the remaining issues for decision are as follows:

- Whether Seabrook and its members had the requisite donative intent when donating the easement;

- Whether the appraisal attached to Seabrook's federal income tax return for 2017 was a qualified appraisal prepared by a qualified appraiser under section 170(f)(11) and Treasury Regulation § 1.170A-13(c);

- The value of the easement Seabrook donated; and

- Whether an accuracy-related penalty applies under section 6662.

For the reasons below, we find that Seabrook and its members had the requisite donative intent and that the appraisal attached to Seabrook's 2017 return was a qualified appraisal prepared by a qualified appraiser. We further find that the value of the easement was $4,718,000 and that, as a result, the penalty applies.[3]

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are shown in U.S. dollars and are rounded to the nearest dollar.

[2] The Commissioner has conceded for purposes of this case that (1) Seabrook's contribution satisfies section 170(h)(4)(A), which sets out the requirements for an adequate conservation purpose, and (2) the rights Seabrook retained under the easement deed are consistent with section 170(h)(5)(A), which requires that a contribution's conservation purpose be protected in perpetuity. Additionally, by Order served February 8, 2023, resolving a Motion for Partial Summary Judgment, we ruled that (1) Seabrook's contribution was of a "qualified real property interest" that satisfied section 170(h)(1)(A); (2) Seabrook's contribution was to a qualified organization within the meaning of section 170(h)(1)(B); and (3) penalties under section 6662A could not be applied to Seabrook, *see Green Valley Investors, LLC v. Commissioner*, 159 T.C. 80 (2022).

[3] The Commissioner also argued that Seabrook's deduction should be limited to its basis under section 170(e). But he explained on brief that, "[a]s a threshold matter, the deduction limitation imposed by section 170(e) is only applicable in this case if the Court determines the fair market value of the conservation easement

3

[*3]                     FINDINGS OF FACT

The following facts are derived from the pleadings, a Stipulation of Facts with attached Exhibits, as supplemented, and the testimony of fact and expert witnesses admitted into evidence at trial. Seabrook is a Georgia limited liability company (LLC) that was classified as a TEFRA partnership[4] for its taxable year ending December 31, 2017. Petitioner Seabrook Manager, LLC (Manager), is Seabrook's tax matters partner. Both entities had their principal places of business in Georgia when the Petition was timely filed.

I.     *The Seabrook Property*

The property over which Seabrook granted the easement (Seabrook property) is in Liberty County, Georgia, approximately 25 aerial miles (or 45 minutes by car) southwest of Savannah. The property is 637 acres,[5] consisting of approximately 370 upland acres and 267 acres of marsh. It sits about four miles east of I–95. The location of the Seabrook property relative to Savannah and I–95 is depicted on the following map, with the Seabrook property indicated by a star:

---

exceeds $5,668,176 (rounded)." Resp't's Op. Br. 166–67. In view of our conclusion on the value of the conservation easement, we do not address this issue further.

[4] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships, including Seabrook.

[5] While the property is 637 acres total, 15 acres were excluded from the easement grant, such that the easement covers 622 acres.

[*4]



The Seabrook property is picturesque, boasting 1.25 miles of tidal creeks and estuarine waters, as well as live oak trees that are hundreds of years old. It also contains frontage along Dickinson Creek and the Georgia coastal salt marsh, providing deep-water access.

The Seabrook property is long and somewhat irregular in shape. The developable acres (approximately 370 upland acres, because the marshland could not be developed) generally are on the western side of the property. Dickinson Creek runs through the eastern side. The property east of the creek (approximately 213 acres) is entirely marsh. There are also 54 acres of marsh west of the creek, as shown in the map and the aerial view photograph below. Dickinson Creek is accessible to the upland portion of the property, at least by dock, at the property's north end (in the general area of the 15-acre outparcel indicated in the map and photo), and at the south end near the property line. The marsh views extend approximately 200 to 300 feet from the eastern portion of the property. The western portion of the Seabrook property does not have views of the marsh.

[*5]





As of 2017, the year at issue, the Seabrook property was undeveloped, with only trees and some permeable paths maintained on the property. There were no commercial, industrial, or residential structures and no sewer or water systems on the property. The Seabrook property may have had access to some electricity, but otherwise it had no utilities. Bald eagles had been sighted on the property, along with at least one wood stork. The Seabrook property was zoned A–1 (agricultural) on the western portion of the property and DM–1 (marsh) on the eastern portion of the property.[6] But Liberty County generally favored development, and it was reasonably likely that

---

[6] A–1 zoning allows for dwellings on one-acre lots, among other uses, whereas DM–1 zoning does not allow for development.

**[*6]** Seabrook could have obtained rezoning to planned use development (PUD)[7] on the upland portion of the property if it had sought it.

Before the transactions described below, the Seabrook property was subject to an FLPA covenant with the State of Georgia.[8]  In general, an FLPA covenant is an arrangement that a landowner may enter into with the state under which the landowner agrees not to develop its property and, in return, Georgia approves a preferred assessment value for property tax purposes.  If an FLPA covenant is breached, the owner loses the preferred assessment and must pay a modest penalty.  FLPA covenants were placed on portions of the Seabrook property in 2009 and 2013, each for a term of 15 years.  At the end of 2017, the penalty for breaching the covenants on the Seabrook property would have been no greater than $51,000.

II.  *Liberty County, Georgia*

Liberty County is a relatively rural county on the eastern coast of Georgia.  The county's economy is largely driven by Fort Stewart, a U.S. army base.  In 2020, more than 43,000 of the county's approximately 65,000 people (or approximately 65%) lived at the Fort or in Hinesville, a city adjacent to Fort Stewart that also serves as Liberty County's county seat.  Fort Stewart and Hinesville are located west of I–95, approximately 30 minutes from the Seabrook property.

As of 2023, Fort Stewart was by far the largest employer in Liberty County, accounting for 21,100 of the 27,633 jobs offered by the country's largest 15 employers.  The next three largest employers as of 2023 were SNF Holding, which employed 1,700 people and operated a chemical manufacturing plant, the Liberty County School District, which employed 1,479 people, and Target, which employed 1,200 people and operated a distribution center in an industrial zone approximately three miles from the Seabrook property.[9]

In addition to Hinesville, Liberty County includes the smaller cities of Allenhurst, Flemington, Gumbranch, Midway, Riceboro, and Walthourville.  The Seabrook property is closest to Midway, which is west of I–95 off one of the two exits in Liberty County.  Midway has a

---

[7] PUD is a custom zoning that allows a mix of commercial, industrial, institutional, or residential development and is decided on a case-by-case basis.

[8] FLPA stands for "Forest Legacy Program Assessment."

[9] This industrial zone is called Tradeport East Industrial Park.

**[*7]** population of approximately 2,200 and includes a grocery store. The Midway area, and Liberty County more generally, does not receive much tourism because there are few attractions and amenities to draw visitors to the area.

Liberty County was hit hard by the 2008 recession. In 2017, Liberty County was still feeling the effects of the related housing collapse, and the real estate market was still depressed. Liberty County also generally trailed neighboring counties in terms of population growth, median household income, and median value of housing units. For example, just north of Liberty County is Bryan County, where Richmond Hill, a suburb of Savannah, is located. (Savannah, located in Chatham County, is about 25 minutes northeast of Richmond Hill, which in turn is about 20 minutes northeast of the Seabrook property.) According to the U.S. Census, from April 2010 to July 2021, the population of Liberty County grew from 63,453 to 65,711, a 3% increase. During that same period, the population of Bryan County grew from 30,233 to 46,938, a 55% increase. Similarly, the median household income in Liberty County around the time the easement was donated was $50,617 and the median value of housing units was $138,400. In Bryan County, those numbers were $81,032 and $243,800, respectively.

III.  *Residential Development in the Area*

A.  *Liberty County*

Although Liberty County is generally rural, particularly east of I–95, it includes a few residential developments near the Seabrook property.

1.  *Yellow Bluff*

Yellow Bluff is a development several miles southeast of the Seabrook property. Midway is the closest city to the development. The community features creek frontage with its own marina, allowing for small boats, kayaking, and fishing. The community has 150 units and a clubhouse, a pool, sidewalks, and trails. It was established in 2006 and has sold about ten units per year over its lifetime, including ten sales in 2017. In 2017, lot prices in the Yellow Bluff development ranged from $70,000 to $200,000.

**[*8]**    2.    *Hampton Island Preserve*

Hampton Island Preserve is a high-end development south of the Seabrook property. Riceboro is the closest city to the development. Hampton Island Preserve consists of a series of salt marsh islands connected to the mainland by a bridge. The community started in 2003, with 4,000 acres and 370 lots. It sold 10 lots per year until further development stopped in 2007 because of management difficulties with the property. It originally was planned to include a Davis Love golf course, an equestrian center and riding trails, an organic farm, boating, sailing, fishing, food and wine, and spa and fitness facilities. As of 2017, Hampton Island Preserve was still dormant, with no development occurring in the previous ten years.

B.    *Coastal Developments in the Region*

1.    *Palmetto Bluff*

Palmetto Bluff is in Bluffton, South Carolina, a city just north of Savannah and adjacent to Hilton Head. Palmetto Bluff is a 20,000-acre development with 4,000 units and 32 miles of waterfront along the May River. Its amenities include a Jack Nicklaus Signature golf course, a five-star quality resort and spa, boating, canoeing, dining, equestrian facilities, target shooting, trails, pools, fitness facilities, gathering spaces, fishing, tennis, pickleball, and bocce ball. It is closer geographically to both Savannah and Hilton Head than Seabrook is to Savannah.

2.    *Kiawah River*

Kiawah River is a community in South Carolina about 30 minutes south of Charleston. The underlying property spans over 2,003 acres with 1,168 units planned in two primary villages. The property includes a five-star luxury boutique inn with rooms, branded residences, and amenities. The property is situated on the Kiawah River with river and marsh views, live oak trees with Spanish moss, and a 100-acre working farm. The farm includes a goatery that produces goat cheese and milk. There also are nature trails and walking and biking paths throughout the property, a 9,000-square-foot community house with a fitness facility, an outdoor pool complex with a junior Olympic-sized family pool and an adult pool, a full-service kitchen and shaded bar with poolside dining, a hot tub, pickleball courts, bocce ball, event space, parks, a kayak launch, viewing areas, and a planned commercial village. Kiawah River hosts events featuring nature, recreation, food, and art.

**[\*9]** Kiawah River, which started in 2017, is just north of Kiawah Island, which was built out in the 1990s. Kiawah Island is a beachfront country club community with 3,800 homes on 10,000 acres. It has at least three golf courses and has hosted multiple PGA Championships as well as the Ryder Cup. Its development brought grocery stores, restaurants, and other amenities to the area years before Kiawah River began.

IV.    *The Devendorfs and the Devendorf Property*

Before the transactions at issue in this case, the Seabrook property belonged to Meredith Devendorf Belford. Before 2015, Ms. Belford, along with her mother, Laura Devendorf (together, Devendorfs), owned 9,600 acres of land in Liberty County, Georgia (Devendorf property).

Nearly all the Devendorfs' impressive holding was acquired originally by Ms. Belford's grandfather on her mother's side, John Porter Stevens. Mr. Stevens grew up on a parcel of land in Liberty County called Springfield Plantation. Portions of that land had been owned by Mr. Stevens's family since King George II granted the family 500 acres of upland and 500 acres of marsh in the 1700s. As an adult, Mr. Stevens prospered in business and, over a 30-year period from the 1920s to the 1950s, he acquired the Devendorf property, which included 20 miles of marsh and riverfront.[10] Of the Devendorf property's 9,600 total acres, 8,400 acres were working forest upland, and the remaining 1,200 acres were salt marsh.

Mr. Stevens originally used the Devendorf property for agriculture, but later shifted his focus to forestry. In general, Mr. Stevens was conservation minded; his goal was to preserve the property in a relatively natural state for as long as possible. His daughter Ms. Devendorf and, eventually, his granddaughter Ms. Belford shared this philosophy. Ms. Belford has managed the Devendorf property since 1993.

V.    *Financial Challenges and Potential Solutions*

Maintaining such a large landholding over so long a period proved challenging. For years, the Devendorfs resisted the idea of development, focusing instead on continuing their sustainable forestry and even

---

[10] Mr. Stevens purchased Seabrook Plantation, of which the Seabrook property makes up a part, in the 1930s.

**[*10]** opening a bed and breakfast and hosting weddings and kayak tours on their property. But revenues were unpredictable and ultimately insufficient to meet their needs. By the early 2000s, the Devendorfs found themselves land-rich but cash-poor (relatively speaking), and they began exploring long-term conservation solutions.

As one option, the Devendorfs considered donating the Devendorf property to an independent conservation organization. None of the organizations they spoke to, however, could assure them that the Devendorf property would be protected. For example, some of the organizations wanted to sell the Devendorf property and use the funds to further the organizations' missions elsewhere. To the Devendorfs, this possibility was unacceptable.

As another alternative, the Devendorfs explored creating their own self-sustaining foundation to hold the land. This option was appealing, but required cash that Ms. Devendorf and Ms. Belford did not have. In 2006, they raised funds by selling a 40-acre parcel for $2.2 million, or $55,000 per acre. The parcel became part of Yellow Bluff. The developer of Yellow Bluff needed the parcel to create a septic drain field adjacent to the development.

Around the same time, the Devendorfs also planned to sell approximately 1,000 acres of property west of I–95 and south of Highway 84. They applied to the Liberty County Board of Commissioners for rezoning of the 1,000 acres to PUD, and the board granted their request in late 2007. After receiving the approval, the Devendorfs listed the northern 500 acres for sale at $17.8 million, or about $35,600 per acre. But the property failed to sell before the market crash of 2008, and, after the crash, the Devendorfs took the property off the market.

Despite this setback, the Devendorfs ultimately did create a foundation, named the Springfield Legacy Foundation, which was recognized by the IRS in 2012. Ms. Devendorf donated 82 acres to the foundation, but she and Ms. Belford never realized their plans to generate an endowment for the foundation by selling the 1,000-acre parcel. Nor did they contribute the $2.2 million generated by the 40-acre Yellow Bluff sale; instead, they used that amount to pay off debt on a credit line that supported their living expenses and other endeavors. At the time of trial, the Devendorfs still owned the parcel they had planned to sell for development before the market crash.

[*11] VI.   *Conservation Easement Alternative*

In 2015, the Devendorfs were still feeling financial pressure and looking for viable conservation options.  Around that time, a longtime friend of the Devendorf family, Charles Kiene, proposed a new solution. Mr. Kiene had experience working with low-income housing credits and film credits, and he thought that a syndicated conservation easement would be a good fit for the Devendorfs.  Specifically, Mr. Kiene proposed that a syndicated conservation easement could raise capital to sustain Ms. Devendorf and Ms. Belford while also accomplishing their conservation objective: protecting the Devendorf property in perpetuity.

The Devendorfs liked Mr. Kiene's proposal and elected to proceed. They decided to split the Devendorf property into tracts and undertake multiple transactions over multiple years.  To effect their plan, they sought help from Mr. Kiene as well as Lynn Fedor, Mr. Kiene's business partner.  Ms. Fedor had certain expertise regarding securities laws and advised clients regarding financial, tax, and estate planning issues.

To facilitate the Devendorfs' easement transactions, Mr. Kiene and Ms. Fedor spoke with various advisors regarding securities and tax issues related to the easement transactions, including lawyers at Morris, Manning, & Martin, LLP, in Atlanta.

In 2015 and 2016, with help from Mr. Kiene and Ms. Fedor, the Devendorfs participated in at least four syndicated conservation easement transactions that encumbered roughly 4,500 acres of the Devendorf property with conservation easements.[11]   Then, in 2017, Ms. Belford began planning the Seabrook transaction.  Around the same time, she planned a second transaction that was also completed in 2017, involving a property just north of Seabrook (Big Sky property).

VII.   *Seabrook Easement Transaction*

A.   *Preliminary Planning*

As the first step in the Seabrook easement transaction, Ms. Belford informed Mr. Kiene and Ms. Fedor which tracts of land she and Ms. Devendorf wanted to monetize and place under easement in 2017.  She communicated her decision via email in late March of that

---

[11] Early on, Ms. Devendorf and Ms. Belford prioritized land owned by Ms. Devendorf because she was elderly and they wanted to transfer assets out of her estate before she died.

**[\*12]** year, stating that she wanted to move forward with the Seabrook property.

Soon thereafter, Mr. Kiene forwarded the email to Clay Weibel, an appraiser, so that he could prepare a preliminary appraisal. Mr. Weibel was also provided with a plat and a street location. He gave Mr. Kiene and Ms. Fedor a preliminary estimated value for the property, which they used to calculate the amount of capital they hoped to raise from investors in the transaction. In the case of the Seabrook transaction, this process yielded a target capital raise of $7.9 million.[12]

Next, a Private Placement Memorandum (PPM) dated October 10, 2017, was prepared for circulation to potential investors. The PPM offered investors the opportunity to subscribe to "units" (or shares) in Seabrook Investors, LLC (InvestCo), which would, the PPM said, ultimately own the Seabrook property through its purchase of a 97% membership interest in Seabrook. Ms. Belford still owned the Seabrook property at that time but, as we will describe, she was soon to transfer the property to Seabrook.

The PPM further explained that, after subscribing to the units in InvestCo, investors would have the opportunity to vote on whether to (1) develop the Seabrook property for residential use, (2) conserve the property by donating a conservation easement, or (3) hold the property for investment. The PPM told potential investors: "In deciding to invest in [InvestCo] and for purposes of analyzing the risks . . . each Investor[] should assume the Conservation Strategy will be elected." Ex. 39-R, p. 28.

Promotional materials prepared shortly after the PPM described the three potential investment strategies in more detail. Regarding the potential tax savings of the conservation strategy, the materials stated as follows:

---

[12] Typically, Mr. Kiene and Ms. Fedor would calculate the target capital raise by dividing the preliminary appraisal value, which they sometimes discounted, by a multiple. For the Seabrook property, for example, the discounted preliminary appraisal value was $31.6 million and the ratio was 4:1, resulting in the target capital raise of $7.9 million ($31.6 million divided by 4). The goal of the 4:1 ratio is that, if a conservation easement is donated, investors are able to claim approximately $4 of deduction for every $1 invested in the transaction, producing a tax benefit that can significantly exceed the amount invested.

**[*13]**

> **Estimated Cost & Tax Benefit of $100,000 membership interest subscription:**
> Federal Tax Savings (**$400,000** Donation Deduction at **39.6% Federal** tax rate): **$158,400**
> State Tax Savings (**$400,000** Donation Deduction at **6.0% State** tax rate): **$24,000**
> **Estimated Total Current Year Tax Savings: $182,400**

Ex. 38-R, pp. 13–17. None of the possible options for investors in the promotional materials was to sell the Seabrook property at its discounted preliminary appraised value of $31.6 million, which the materials said represented a 10% reduction from the fair market value of the property.

The PPM cautioned investors that, despite its anticipated ownership of a 97% interest in Seabrook, InvestCo could not "unilaterally cause [Seabrook] to implement an Investment Strategy." Ex. 39-R, p. 18. It explained that "[InvestCo] will recommend a specific Investment Strategy to [Seabrook], and each [Seabrook] Manager needs to obtain approval of the other [Seabrook] Manager . . . in order to proceed with the recommended Investment Strategy." *Id.*

Ultimately, the units in InvestCo were sold to 96 individual investors, and Seabrook proceeded with the conservation strategy as described further below.

    B.    *Transaction Mechanics*

    1.    *Creation of Entities*

In June 2017, in anticipation of the Seabrook transaction, Seabrook, Manager, and InvestCo were organized as Georgia LLCs. Initially, Manager was the sole owner and manager of InvestCo. Manager and Ms. Belford were the members and managers of Seabrook. And Manager was 100% owned indirectly by Charles Kiene and Lynn Fedor.

Each of the three entities had a separate role in the transaction. Manager was formed to manage the initial monetization of Seabrook and then to help manage the back-office operations of Seabrook. It handled the business side of things and legal requirements with respect to Seabrook, such as preparing Seabrook's tax returns and annual reports.

**[\*14]** Seabrook itself was formed to hold the Seabrook property. Maintaining an interest in Seabrook allowed Ms. Belford to continue to participate in the conservation management of the Seabrook property. And Wade McDonald, a forester, was later made a manager of Seabrook without an ownership interest for similar reasons.

InvestCo was established as a vehicle to allow outside investors to invest in Seabrook in an orderly fashion. For example, Mr. Kiene was concerned that if outside investors had invested directly in the Seabrook property, there would have been no clear delineation of rights or definition of who owned what. And keeping Ms. Belford's interest separate from that of other investors was desirable because it allowed her and Mr. McDonald to control decisions regarding forestry management on the property.

### 2. *Execution of Agreements*

On November 22, 2017, the various parties entered into three agreements that would lay the groundwork for Seabrook's eventual easement contribution.

First, Seabrook, Ms. Belford, and Manager entered into a Contribution Agreement. Under that agreement, Ms. Belford agreed to contribute the Seabrook property to Seabrook in exchange for a 99% interest in Seabrook, and Manager agreed to contribute $1,000 in exchange for a 1% interest. Ms. Belford conveyed the Seabrook property to Seabrook on November 30, 2017, by recording a limited warranty deed in Liberty County.[13] Following the conveyance, Seabrook owned the Seabrook property, with Ms. Belford owning 99% of Seabrook and Manager owning the remaining 1%.

Second, Ms. Belford and Charles Kiene (acting on behalf of Manager) signed the Operating Agreement of Seabrook. The Operating Agreement stated that Ms. Belford and Manager were the managers of Seabrook and that neither could take any action related to Seabrook without the written consent of the other. Ms. Belford could, however, cause Seabrook to redeem Manager's ownership interest in Seabrook for $500 if InvestCo had not purchased 97% of Ms. Belford's membership interest in Seabrook by December 29, 2017.

---

[13] Manager contributed its $1,000 sometime after December 20, 2017, and before the end of the year. Before the contribution, the liability of Manager was reflected on Seabrook's books.

[*15] Third, Ms. Belford and InvestCo entered into a Membership Interest Purchase Option Agreement (Option Agreement). The Option Agreement granted InvestCo the option to purchase a 97% interest in Seabrook from Ms. Belford for $4.74 million on or before December 31, 2017.

3. *Acquisition of Interest in Seabrook and Contribution of Easement*

On December 22, 2017, InvestCo exercised its option and acquired the 97% interest in Seabrook from Ms. Belford. Following the acquisition, Seabrook continued to own the Seabrook property while Manager owned 1% of Seabrook, Ms. Belford owned 2% of Seabrook, and InvestCo owned 97% of Seabrook.

On the same day InvestCo exercised its option, InvestCo, Manager, and Ms. Belford executed an Amended and Restated Operating Agreement of Seabrook Property, LLC (Amended Agreement). The Amended Agreement designated Manager, Ms. Belford, and Mr. McDonald as the managers of Seabrook. InvestCo was simply a member. The Amended Agreement generally granted the managers the authority to operate Seabrook, subject to certain parameters. Significantly, the Amended Agreement required the managers to explore and recommend to Seabrook's members one of three options with respect to the Seabrook property (the same develop, hold, and conserve options described in the PPM). If a majority of Seabrook's members accepted the managers' recommendation, then the managers were required to pursue that option. The agreement was silent on what would happen if the members rejected the managers' recommendation. Members could remove the managers only in specified circumstances. And members could transfer their interests in Seabrook only with the prior written consent of the managers, and subject to a right of first refusal for Ms. Belford.

Less than a week after InvestCo exercised its option and the Amended Agreement was executed, on December 28, 2017, Seabrook executed a deed of conservation easement over 622 acres of the Seabrook property to the Southern Conservation Trust. Seabrook filed the Deed of Conservation Easement on December 29, 2017, in Liberty County.

[*16] VIII. *Big Sky Easement Transaction*

Although our primary focus here is on the Seabrook transaction, we pause briefly to describe a few key aspects of the Big Sky transaction, which was also completed in 2017. The Big Sky property was just north of Seabrook in Liberty County. It consisted of 654 acres, with 295 acres of upland and 359 acres of marsh and river. Ms. Belford received $3.78 million for her participation in that transaction, which was structured similarly to the Seabrook transaction.[14] Specifically, Ms. Belford sold a 97% interest in an entity to which she had contributed the Big Sky property. Soon thereafter, that entity donated a conservation easement over the Big Sky property.

IX. *The Appraiser and Appraisal*

Before the Seabrook transaction, Mr. Kiene had been looking for an appraiser to value the Seabrook property. Mr. Kiene contacted two land trusts, the Georgia-Alabama Land Trust and the Southern Conservation Trust, and they both recommended Clayton Weibel. Another contact also recommended Mr. Weibel, who had spoken at various land-trust events Mr. Kiene's contact had organized. Mr. Kiene was impressed with Mr. Weibel's resume, and Seabrook hired him.

Following his engagement, Mr. Weibel prepared an appraisal of the Seabrook property and the conservation easement that would be donated by Seabrook. Initially, the appraisal stated that "[its] effective date . . . is November 24, 2017, the date of the report is November 28, 2017, and the date of the conservation easement was recorded is Prior to December 31, 2017." Ex. 5-J, p. 1.

The appraisal included various maps and aerial photographs of the Seabrook property, as well as associated property identification numbers and a description of its general location on Fort Morris Road and Dickinson Creek. Based on an analysis that focused primarily on the characteristics of the Savannah market, the appraisal concluded that the highest and best use of the Seabrook property before donation of the easement was residential development. The appraisal concluded that the easement donated by Seabrook was worth $35.85 million.

_____

[14] For example, Ms. Belford contributed her property to an LLC for a 99% interest in the LLC, while a manager entity contributed $1,000 to the same LLC for a 1% interest. Ms. Belford then sold a 97% interest in the LLC for $3.78 million.

**[\*17]** The appraisal calculated the value of the easement by first concluding that the value of the Seabrook property before the donation was $37 million, based on a valuation of $100,000 per upland acre. Then, the appraisal reduced that amount by the value of the property after the donation, which it concluded was only $1.15 million. The appraisal assumed that the easement would apply to the whole of the Seabrook property (all 637 acres) and so did not consider the value of any outparcel.

After receiving a copy of the appraisal, Mr. Kiene realized that it did not account for the 15-acre outparcel that was excluded from the easement. Ms. Fedor informed Mr. Weibel of the issue, and he prepared a revised appraisal and transmitted it to Seabrook on January 20, 2018. The revised appraisal stated that "[its] effective date . . . is December 29, 2017, the date of the report is January 20, 2018, the easement contribution date is December 28, 2017, and the date the conservation easement was recorded is December 29, 2017." Ex. 7-P, p. 2. Unlike the original appraisal, the revised appraisal accounted for the 15-acre outparcel. Once again, it determined that the highest and best use of the Seabrook property before donation of the easement was residential development. The appraisal determined that the easement donated by Seabrook was worth $36,605,000. This conclusion was based on a value for the Seabrook property before the easement was contributed of $37,750,000 and a value after the easement was contributed of $1,145,000.

X.     *Tax Returns and IRS Examination*

Seabrook filed a 2017 Form 1065, U.S. Return of Partnership Income, for the short period beginning December 21, 2017, and ending December 31, 2017 (2017 Form 1065), claiming a noncash charitable contribution deduction of $32,581,443 for the conveyance of the conservation easement over 622 acres of the Seabrook property.[15] A Form 8283, Noncash Charitable Contributions, attached to Seabrook's 2017 Form 1065 reported a fair market value of the conservation easement of $35,850,000 and also reflected a "conservation easement reserve" of $3,268,557.[16] An addendum to the Form 8283 reported the appraised fair market value of the Seabrook property before the

---

[15] InvestCo claimed its proportionate share of the noncash charitable contribution deduction in the amount of $31,604,000 (97% of $32,581,443) in 2017.

[16] The difference between these two amounts equals $32,581,443, the amount Seabrook claimed as a charitable contribution deduction.

**[\*18]** donation of the easement was $37 million, and the fair market value after the donation was $1.15 million.

The 2017 Form 1065 included the appraisal dated November 28, 2017, that was prepared and signed by Mr. Weibel.  In other words, the return included the first version of the appraisal, which determined a before-easement value of $37 million and mistakenly did not account for the 15-acre outparcel.

The IRS examined Seabrook's 2017 Form 1065.  A revenue agent made the initial determination to assert penalties against Seabrook, and that determination was approved, in writing, by the revenue agent's immediate supervisor before the revenue agent communicated the penalties to Seabrook.  On February 24, 2021, the Commissioner issued to Manager an FPAA for Seabrook's tax year ended December 31, 2017.  The FPAA denied the full amount of Seabrook's charitable contribution deduction and also determined a 40% accuracy-related penalty under section 6662(h) or, in the alternative, a 20% reportable transaction understatement penalty under section 6662A.  To the extent neither of those penalties applied, the FPAA determined a section 6662(a) 20% accuracy-related penalty for an underpayment due to a substantial understatement of income tax under section 6662(b)(2) and (d) and for negligence and disregard of rules and regulations under section 6662(b)(1) and (c).

Manager timely petitioned our Court for review.

XI.  *Trial*

During a weeklong trial of this case, the parties called various witnesses to establish the value of the easement Seabrook contributed.  Among those witnesses were the following experts.

A.  *Manager's Experts*

1.  *Belinda Sward*

Manager offered expert testimony from Belinda Sward, the founder of Strategic Solutions Alliance—a real estate consulting firm.  Ms. Sward was recognized by the Court as an expert in market analysis and the feasibility of developing real property.  Ms. Sward offered a "retrospective market analysis" detailing both demand and development projections for a residential development on the Seabrook property beginning in 2017.  Ex. 100-P, p. 1.

**[\*19]** According to Ms. Sward, her methodology consisted of "primary research and analysis of relevant secondary data over the period of 2016-2017 and relevant proceeding years . . . an interview process conducted by Belinda Sward with local and regional real estate professionals . . . [and] confidential data and analysis from previous and relevant work in the regional market." *Id.* at 6. The thrust of Ms. Sward's report was that the Seabrook property's natural aesthetics and marshland access, coupled with a growing demand for second/vacation homes in the Savannah region, uniquely positioned the Seabrook property to be developed and marketed as a "modern" residential community with "an emphasis on health and wellness." *Id.* at 77–78. From this, the report concluded that the Subject Property "has many characteristics that support its development as a regionally positioned second-home residential community." *Id.* at 16.

### 2. *Jeff Pate*

Manager also offered expert testimony from Jeff Pate, a land planner and golf course designer with over 26 years of experience. Mr. Pate prepared a conceptual capacity plan for a proposed development on the Seabrook property. Mr. Pate received guidance from Ms. Sward as to the type and size of the lots and placement of the lots reflected in the plan. Ms. Sward also provided guidance as to the amenities that the proposed development should offer. The final capacity plan proposed that 816 units of various sizes could be developed on the Seabrook property's 370 upland acres, along with various amenities such as a community dock, a vegetable garden, tennis and pickleball courts, a pool, a fitness center, and nature trails and bike paths, among others.

### 3. *Gregory Eidson*

Finally, Manager offered expert testimony from Gregory Eidson, a certified real property appraiser in Georgia. Mr. Eidson has decades of appraisal experience, has taken several classes on the valuation of conservation easements, and has "fully" appraised two conservation easements. Mr. Eidson was recognized by the Court as an expert in real estate valuation, including conservation easements.

In his report, Mr. Eidson determined that the highest and best use of the Seabrook property before the easement was "vacant land that could be developed as a Master Planned Residential Development." Ex. 102-P, p. 81. Additionally, Mr. Eidson determined the highest and

**[*20]** best use after the easement to be "vacant land for agricultural and recreational use." *Id.* at 122. In reaching these conclusions, Mr. Eidson's report relied heavily on data from Ms. Sward's "retrospective market analysis" and Mr. Pate's land development plan.

To determine the value of the Seabrook property before the easement, Mr. Eidson used the sales comparison approach and the discounted cashflow (DCF) income approach and subsequently averaged the two values. Under the sales comparison approach, Mr. Eidson determined that the "before value" of the property was $32.23 million. He reached this conclusion by identifying seven properties, located in various states, that he viewed as comparable. Under the income approach, Mr. Eidson discounted the anticipated future net operating income streams and a residual value into an estimate of present value. From this, Mr. Eidson determined that the value of the property before the easement was $34.84 million. Mr. Eidson averaged the results of his sales comparison approach and his income approach and arrived at $33.52 million as the final value before the easement.

Mr. Eidson then determined the value of the Seabrook property after the easement to be $2 million. Mr. Eidson reached this conclusion using the sales comparison method, choosing sales of five comparable properties in Georgia. Finally, Mr. Eidson subtracted the value after the easement and an additional $475,000 of excluded land parcel value from the value before the easement to reach a final easement value of $31.045 million.

B. *The Commissioner's Expert: Gerald Barber*

The Commissioner offered expert testimony from Gerald Barber. Mr. Barber has decades of real estate appraisal experience and has appraised over 200 conservation easements. Mr. Barber was recognized as an expert in real estate valuation, conservation easements, landscape architecture, and land planning.

In his appraisal, Mr. Barber determined the highest and best use of the Seabrook property before the easement to be "its current recreational use with potential for small scale large tract residential development." Ex. 200-R, p. 22. Additionally, he determined the highest and best use after the easement to be "a large undeveloped tract of land dedicated to continued recreational uses with a minimum amount of timber harvests to encourage a healthy forest and premium recreational and wildlife habitat characteristics." *Id.* Mr. Barber reached these

**[\*21]** conclusions by conducting a market study that examined the number of land permits filed with Liberty County in three preceding years, the median income of Liberty County, and geographic and ecological data related to the Seabrook property. Mr. Barber testified that he "rode around the site [many] times looking at what's there, looking at what potentially the people are interested in." Tr. 1256. From this, Mr. Barber concluded that the potential for heavy residential development was not there and that use for recreational activities—such as forestry or hunting—was a more probable highest and best use.

Mr. Barber calculated the market value of the easement to be $1.045 million, representing the difference between a value before the easement of $2.06 million and a value after the easement of $1.015 million. To reach this conclusion, Mr. Barber relied primarily on the sales comparison approach, supplemented by his market analysis and interviews with buyers and sellers of properties in the area.[17] For his "before" analysis, Mr. Barber proposed six comparable properties, all in Georgia. Three of the six properties were in Liberty County, and all six properties were within 50 miles of the Seabrook property. For his "after" analysis, Mr. Barber proposed three comparable properties in Georgia—one of which was in Liberty County.

## OPINION

I.    *Burden of Proof*

Rule 142(a)(1) provides that "[t]he burden of proof[18] shall be upon the petitioner, except as otherwise provided by statute or determined by the Court." Generally, the IRS's adjustments in an FPAA are presumed to be correct, and the taxpayer bears the burden of proving them wrong. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013). The taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a

---

[17] Mr. Barber also prepared an analysis using the income approach, but disavowed it at trial.

[18] As to burden of production, section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability *of any individual* for any penalty, addition to tax, or additional amount." (Emphasis added.) However, section 7491(c) does not apply to TEFRA partnership-level proceedings (such as this case). *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Consequently, as a general rule, in a TEFRA partnership case the petitioner has not only the burden of proof but also the burden of production, even as to any penalty.

[*22] taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

If, in any court proceeding, the taxpayer puts forth credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer and meets certain other requirements, the burden of proof shifts to the Commissioner as to that issue. I.R.C. § 7491(a)(1) and (2). Additionally, the Commissioner has the burden of proof with respect to any "new matter" he raises. *See* Rule 142(a).

When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail, and thus a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. We do not perceive an evidentiary tie in this case and are able to decide the remaining issues on the preponderance of the evidence.[19] *See, e.g.*, *Bordelon v. Commissioner*, T.C. Memo. 2020-26, at *11.

## II.   *Charitable Contribution Deduction*

### A.   *Donative Intent*

Section 170(a) allows a deduction for a charitable contribution, which section 170(c) defines as including a "contribution or gift" to or for the use of a charity. "The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration." *United States v. Am. Bar Endowment*, 477 U.S. 105, 118 (1986). If a transaction with a charity "is structured as a *quid pro quo* exchange"—i.e., if the taxpayer receives property or services equal in value to what he conveyed—there is no "contribution or gift" within the meaning of the statute. *Hernandez v. Commissioner*, 490 U.S. 680, 701–02 (1989).

In assessing whether a transaction constitutes a "quid pro quo exchange," we give most weight to the external features of the transaction, avoiding imprecise inquiries into taxpayers' subjective motivations. *See id.* at 690–91; *Christiansen v. Commissioner*, 843 F.2d

---

[19] We therefore do not address further the arguments the parties raised on brief regarding the burden of proof.

**[\*23]** 418, 420 (10th Cir. 1988). "If it is understood that the property will not pass to the charitable recipient unless the taxpayer receives a specific benefit, and if the taxpayer cannot garner that benefit unless he makes the required 'contribution,' the transfer does not qualify the taxpayer for a deduction under section 170." *Costello v. Commissioner*, T.C. Memo. 2015-87, at \*27; *see also Christiansen v. Commissioner*, 843 F.2d at 420–21; *Graham v. Commissioner*, 822 F.2d 844, 849 (9th Cir. 1987), *aff'g* 83 T.C. 575 (1984), *aff'd sub nom. Hernandez v. Commissioner*, 490 U.S. 680. However, if the benefit received is merely incidental to a charitable purpose, then a deduction is allowable. *See McGrady v. Commissioner*, T.C. Memo. 2016-233, at \*25 (citing *McLennan v. United States*, 24 Cl. Ct. 102, 107 (1991), *aff'd*, 994 F.2d 839 (Fed. Cir. 1993)).

The Commissioner argues that Seabrook is not entitled to a charitable contribution deduction because "[t]he external features of the transaction overwhelmingly show that [Seabrook] donated the conservation easement intending to monetize the tax deduction for its members and that the 'predominant purpose' of the easement transfer was not charitable." Resp't's Op. Br. 123. In the Commissioner's view, "[Seabrook] cannot demonstrate that it intended to donate a conservation easement in excess of the value expected to be received in return" because "[Seabrook's] intent was to receive substantial tax benefits and pass them through to the investors." *Id.* at 123–24. The Commissioner points to the significant amount of the promised tax benefits, how the transaction was marketed to potential investors, and how advisors were compensated as further evidence of the transaction's profit-orientation. In short, the Commissioner says, "the crux of this transaction was to provide tax benefits, not to engage in any charitable giving." *Id.* at 125.

We rejected similar donative intent arguments from the Commissioner in *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, at \*28, *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at \*42, *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*28, and *Oconee Landing Property, LLC v. Commissioner*, T.C. Memo. 2024-25, at \*37, *supplemented by* T.C. Memo. 2024-73, and we reject them again here. In *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at \*28, we found the objective fact that a perpetual conservation easement was donated to a charitable organization defeated the Commissioner's contention as to the donor's subjective intent. Similarly, in *Oconee Landing*, T.C. Memo. 2024-25, at \*38, we explained that, unlike the quid pro quo cases the Commissioner cited, any benefits

**[\*24]** to the taxpayer from contributing the easement were provided not by the recipient of the easement, but by the U.S. Treasury. As we said there, "[the Commissioner] has cited, and we have discovered, no case in which the tax benefits associated with a charitable contribution deduction have been deemed a 'quid pro quo' that negates the donor's charitable intent." *Id.* We agree with the reasoning of our prior cases and adopt it here.

### B.    *Substantiation and Documentation*

Section 170(f)(11) disallows a deduction for certain noncash charitable contributions unless specified substantiation and documentation requirements are met. In the case of a contribution of property valued in excess of $500,000, the taxpayer must obtain and attach to his return "a qualified appraisal of such property." I.R.C. § 170(f)(11)(D). An appraisal is "qualified" if it is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards" and meets requirements set forth in "regulations or other guidance prescribed by the Secretary." I.R.C. § 170(f)(11)(E)(i). In the case of a partnership or an S corporation, the qualified appraisal requirements "shall be applied at the entity level." I.R.C. § 170(f)(11)(G).

In this case, Seabrook obtained an appraisal of the Seabrook property from Mr. Weibel and attached that appraisal to its 2017 return. Nevertheless, the Commissioner argues that Seabrook failed to meet both the "qualified appraisal" and the "qualified appraiser" requirements. We address the Commissioner's arguments in turn.

### 1.    *Qualified Appraisal*

To be a qualified appraisal under section 170(f)(11)(E)(i), an appraisal of property must be (1) treated as a qualified appraisal under regulations or other guidance prescribed by the Secretary and (2) conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed by the Secretary.

Treasury Regulation § 1.170A-13(c)(3)(i) defines a qualified appraisal as a document that, among other things, (1) relates to an appraisal that is made not earlier than 60 days before the date of contribution of the appraised property and not later than the due date (including extensions) of the return on which a deduction is first claimed under section 170; (2) is prepared, signed, and dated by a qualified

**[\*25]** appraiser; (3) includes certain information required by the regulations; and (4) does not involve an appraisal fee that violates certain prescribed rules. The information required by the regulations includes, among other things, (1) an adequately detailed description of the contributed property, (2) the date (or expected date) of the contribution to the donee, (3) the terms of certain agreements or understandings entered into with respect to the property, (4) certain information about the qualified appraiser and the purpose of preparing the appraisal, (5) the date (or dates) on which the property was appraised, (6) the fair market value of the property on the date of contribution, and (7) the method and basis of valuation. Treas. Reg. § 1.170A-13(c)(3)(ii).

Strict compliance with these rules is sufficient, but not necessary, to satisfy the regulatory requirements. In *Bond v. Commissioner*, 100 T.C. 32, 41 (1993), we held that the requirements of Treasury Regulation § 1.170A-13 were directory rather than mandatory and asked whether the taxpayers had substantially complied with the requirements. *Cave Buttes, L.L.C. v. Commissioner*, 147 T.C. 338, 349 (2016).

We have followed the same approach in subsequent cases. For example, in *Hewitt v. Commissioner*, 109 T.C. 258, 265 (1997), *aff'd per curiam*, 166 F.3d 332 (4th Cir. 1998) (unpublished table decision), we built on *Bond* and said that the predominant question in substantial-compliance cases was whether "the taxpayers had provided most of the information required, and the single defect in furnishing everything required was not significant." We have also observed "that our focus in substantial-compliance cases [is] on whether the appraisals described the contributed property well enough to permit the Commissioner to understand the appraiser's valuation methodology." *Cave Buttes, L.L.C.*, 147 T.C. at 350–51.

> a. *Failure to Include a Sufficient Description*

The Commissioner's first complaint regarding the Weibel appraisal is that it did not describe the Seabrook property in sufficient detail for a person unfamiliar with the property to ascertain that the appraised property was the same as the Seabrook property. *See* Treas. Reg. § 1.170A-13(c)(3)(ii)(A). Nowhere in the Weibel appraisal, the Commissioner says, is "an exact legal or other description of the Seabrook property." Resp't's Op. Br. 103. Specifically, the Commissioner points to several blank addenda and the failure to provide an address, a county tax parcel identification number, or "a clearly

[*26] identified map." Resp't's Op. Br. 104. The Commissioner also notes that, while the contributed easement ultimately was over 622 acres, the appraised easement was over 637 acres.[20]

We disagree with the Commissioner and conclude that the Weibel appraisal's description of the Seabrook property was adequate. We have said that the purpose of the description requirement "is to provide the IRS with information sufficient to evaluate claimed deductions and assist it in detecting overvaluations of donated property." *See Costello*, T.C. Memo. 2015-87, at *17 (citing *Smith v. Commissioner*, T.C. Memo. 2007-368, 2007 WL 4410771, at *13, *aff'd*, 364 F. App'x 317 (9th Cir. 2009)). As Manager points out, the Weibel appraisal did in fact include a tax parcel ID number, a map of the Seabrook property with the tax plat number, and a survey. It also provided a map of the Seabrook Property relative to I–95 and included physical pictures of the Seabrook Property, including pictures from the public road. Ex. 5-J, pp. 8, 26–27, 39, 60, 127–30. When faced with similar facts in a prior case, we said as follows:

> The . . . appraisal describes the property as a "hillside lot with mountain and city views." It provides an address, maps, and aerial photographs that identify the property. It says the property is "located at the southwest corner of Jomax Road and Cave Creek Dam Road in north Phoenix" and cites specific measurements of the lots. Since the purpose of this requirement is to let the IRS know what's being donated, a description by address and characteristics is enough to strictly comply with the regulation.

*Cave Buttes, L.L.C.*, 147 T.C. at 354. So too here, the description Mr. Weibel gave was enough "to let the IRS know what's being donated." *Id.* That the description may have been vague in some respects or reflected some minor mistakes (e.g., the inclusion of 15 additional acres that ultimately were excluded from the contribution) does not change our view.

b.      *Failure to Include the Date of Contribution*

Next, the Commissioner contends that the Weibel appraisal failed to include the date or the expected date that the contribution was to be made as required by Treasury Regulation § 1.170A-13(c)(3)(ii)(C). The

---

[20] Recall that Seabrook attached to its return an earlier draft of the Weibel appraisal that did not account for the 15-acre outparcel.

[*27] Commissioner notes that the Weibel appraisal, which itself was dated November 28, 2017, says simply that the easement contribution date is "Prior to December 31, 2017," and that the date the easement was recorded is also "Prior to December 31, 2017." The Commissioner further says that the absence of a specific date renders him "unable to verify that the [Weibel a]ppraisal in fact complies with [Treasury Regulation §] 1.170A-13(c)(i)(A) (requiring that a qualified appraisal be 'made not earlier than 60 days prior to the date of contribution of the appraised property nor later than [the due date of the tax return on which the contribution deduction is first claimed]).'" Resp't's Op. Br. 105. Additionally, according to the Commissioner, it also prevents him from verifying "that [the] fair market value of the conservation easement listed in the Weibel [a]ppraisal is as of the date or expected date of contribution." Resp't's Op. Br. 106.

The Commissioner's purported concerns are overblown. First, the Weibel appraisal was dated November 28, 2017, and it stated that the date of appraisal was November 24, 2017. Therefore, when it said that the easement would be contributed and recorded "Prior to December 31, 2017," it was representing that the easement would be contributed within 37 days of the date of appraisal. The easement was in fact contributed on December 28, 2017, a point that was disclosed in the Deed of Conservation Easement attached to Seabrook's tax return for 2017. So the Commissioner can easily see that the 60-day requirement was satisfied. And the Commissioner does not point to any events between the date of appraisal and the date of the contribution that would have materially affected the fair market value of the easement. *See Cave Buttes, L.L.C.*, 147 T.C. at 355 (holding that, absent some "significant event that would obviously affect the value of the property" between the appraisal date and the contribution date, an appraisal that was late by a few weeks substantially complied with the regulations); *see also Zarlengo v. Commissioner*, T.C. Memo. 2014-161, at *35 (reaching the same conclusion with respect to an appraisal report that was effective six months before the appraised easement was recorded).

Additionally, we have held that failing to include the date of contribution in the appraisal is not significant when the return includes a Form 8283 that does so. *See, e.g., Emanouil v. Commissioner*, T.C. Memo. 2020-120, at *40 (finding that taxpayers substantially complied with the regulatory requirements by disclosing the contribution date on the appraisal summary); *Zarlengo*, T.C. Memo. 2014-161, at *36 (same); *Simmons v. Commissioner*, T.C. Memo. 2009-208, 2009 WL 2950610, at *7–8 (same), *aff'd*, 646 F.3d 6 (D.C. Cir. 2011). Here, the Weibel

**[\*28]** appraisal represented that the contribution date would be within 37 days of the valuation date and Seabrook's return for 2017 attached the Deed of Conservation Easement confirming the date of the contribution. Accordingly, we find that the absence of the precise date from the Weibel appraisal is not fatal in this case.

    c.  *Failure to Include the Terms of Relevant Agreements*

  Next, the Commissioner contends that the Weibel appraisal fails to comply with Treasury Regulation § 1.170A-13(c)(3)(ii)(D). That provision requires that a qualified appraisal include:

> The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, including, for example, the terms of any agreement or understanding that—
>   (*1*) Restricts temporarily or permanently a donee's right to use or dispose of the donated property,
>   (*2*) Reserves to, or confers upon, anyone (other than a donee organization or an organization participating with a donee organization in cooperative fundraising) any right to the income from the contributed property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire, or
>   (*3*) Earmarks donated property for a particular use[.]

Among other things, this information "enables the IRS to determine whether the appraiser took restrictions on the disposition of the contributed property into account when appraising it." *Alli v. Commissioner*, T.C. Memo. 2014-15, at \*25. It also "is essential to enable the IRS to evaluate . . . whether the donors have received or will receive something in exchange for their gift." *Costello*, T.C. Memo. 2015-87, at \*19.

  According to the Commissioner, the Weibel appraisal falls short in two respects. First, he says, the appraisal does not acknowledge or contend with FLPA covenants that Ms. Belford placed on the property in 2009 and 2013. Second, he argues, the appraisal failed to disclose or

**[\*29]** analyze the Option Agreement to acquire Ms. Belford's interest in Seabrook for $4.74 million, which was in place before the appraisal's effective date. We discuss each item in turn.

### i. *FLPA Covenants*

In general, an FLPA covenant is an arrangement that a landowner may enter into with the State of Georgia whereby the landowner agrees not to develop its property and, in return, Georgia approves a preferred assessment value for property tax purposes. Ms. Belford entered into FLPA covenants with respect to portions of the Seabrook property in 2009 and 2013, each for a term of 15 years. Proceeding with development of the Seabrook property before the end of the 15-year periods would have breached the FLPA covenants, assuming they were still in place at the time of the development.[21]

In view of these facts, the Commissioner invokes the rule we articulated in *RERI Holdings I, LLC v. Commissioner*, 143 T.C. 41 (2014). There, we said that the omission of a restriction from an appraisal may prevent the appraisal from constituting a qualified appraisal only if it is "a restriction that reasonably can be said to have some adverse impact on the value of the donated asset." *Id.* at 80.

We agree with this rule, but find that applied here it cuts against the Commissioner. At trial, David Scott Wall, the GIS and Mapping Supervisor for the Liberty County Assessor's Office, testified that Seabrook could have broken the FLPA covenants at any time and incurred only minimal penalties. Such penalties would be no more than $51,000. In other words, the maximum penalty represents approximately 0.14% of the total fair market value of the easement determined by the Weibel appraisal ($35.85 million).

This straightforward computation dooms the Commissioner's position. Put simply, we will not disqualify the appraisal for overlooking a restriction that Seabrook could have breached at any time, incurring only (in this context) a de minimis penalty. Such a restriction poses no real bar to development and does not materially affect the property's fair

---

[21] Manager argues, among other things, that the FLPA covenants were no longer in place when the easement was contributed. But given our analysis of the Commissioner's argument, we need not decide this point or pass on Manager's other arguments.

**[\*30]** market value.[22] In view of these specific circumstances, we conclude that, even if the FLPA covenants were still in effect, their omission from the Weibel appraisal did not prevent the appraisal from substantially complying with the regulatory requirements.

## ii. *Option Agreement*

The Commissioner takes a similar view of the Weibel Appraisal's failure to discuss the Option Agreement. The Option Agreement was executed on November 22, 2017, and, pursuant to the agreement, InvestCo acquired Ms. Belford's interest in Seabrook on December 22, 2017. The Commissioner argues that the omission of the Option Agreement from the appraisal "appears to be a direct attempt to hide material facts from the IRS and mislead the reader as to the acquisition of the Seabrook property by [Seabrook]." Resp't's Op. Br. 109. "Further," the Commissioner says, "the omission disguises the extent of the valuation disparity between the acquisition cost of the Seabrook property and the appraised value." *Id.*

We see at least two problems with the Commissioner's position. First, Treasury Regulation § 1.170A-13(c)(3)(ii)(D) applies to agreements "by or on behalf of the donor or donee" of a conservation easement. Here, neither the donor (Seabrook) nor the donee (Southern Conservation Trust) was a party to the Option Agreement. Nor was the Option Agreement, which concerned the purchase of interests in Seabrook and not the Seabrook property, undertaken on Seabrook's behalf. Accordingly, the Option Agreement is not covered by the regulation.

Second, and more generally, we note that the illustrative examples in Treasury Regulation § 1.170A-13(c)(3)(ii)(D) are forward-looking in that they concern agreements that bear directly on the contribution itself or agreements that affect the donee's interest in the property going forward. Consistent with this observation, the regulation's operative rule mentions agreements entered into by the donor related to any "use, sale, or other disposition" of the property, but,

---

[22] As Manager explains in its brief, this point distinguishes the FLPA covenants from the restrictions at issue in *Mountanos v. Commissioner*, T.C. Memo. 2013-138, *supplemented by* T.C. Memo. 2014-38, *aff'd*, 651 F. App'x 592 (9th Cir. 2016). As our Court explained, the taxpayer in that case failed to demonstrate that restrictions imposed by a "Williamson Act contract" would not have prevented development of the subject property within a reasonable time. *Id.* at \*14–16. By contrast, Manager has made the requisite showing.

**[*31]** notably, not to any *purchase* of the property by the donor. *Id.* Therefore, even assuming the Option Agreement related to the purchase of the Seabrook property by the donor (Seabrook), which it does not, we would question whether such an agreement (i.e., one that (1) is related to the donor's purchase of the property *before* the contribution, and (2) does not impose any constraints related to future uses or dispositions of the property) would be covered by the regulation.

In view of the foregoing, we find that the omission of the Option Agreement did not prevent the Weibel appraisal from substantially complying with the regulations.

> d.      *Failure to Comply with Generally Accepted Appraisal Standards*

Finally, the Commissioner seeks to disqualify the Weibel appraisal on the grounds that it was not prepared in accordance with generally accepted appraisal standards, alleging noncompliance with the *Uniform Standards of Professional Appraisal Practice* (USPAP).

Section 170(f)(11)(E)(i)(II) specifies, in relevant part, that a qualified appraisal must be "conducted by a qualified appraiser in accordance with generally accepted appraisal standards." The Department of the Treasury provided transitional guidance in I.R.S. Notice 2006-96, 2006-2 C.B. 902. According to that Notice, an appraisal will meet the specifications of section 170(f)(11)(E) if, for example, "the appraisal is consistent with the substance and principles of [USPAP]." Notice 2006-96, § 3.02(2), 2006-2 C.B. at 902.

Relying on his expert Steven Shockley, the Commissioner argues that Mr. Weibel failed to comply with USPAP. The Commissioner maintains that "the Weibel [a]ppraisal repeatedly violates USPAP and does not meet any other generally accepted appraisal standards." Resp't's Op. Br. 111. Specifically, the Commissioner avers, among other things, that the Weibel appraisal erroneously states the Seabrook property is in Savannah, mistakenly implies that utilities were in place on the Seabrook property, fails to mention the FLPA covenants in place on the Seabrook property, and impermissibly employs an incomplete highest and best use conclusion. These errors, the Commissioner says, amount to a failure to comply with USPAP.

"Appraising is not an exact science and has a subjective nature." *Gorra v. Commissioner*, T.C. Memo. 2013-254, at *48. USPAP is widely recognized and accepted as setting out standards applicable to the

[*32] appraisal profession. Adherence to those standards is evidence that the appraiser is applying methods that are generally accepted within the appraisal profession. Therefore, at a minimum, compliance with USPAP is an indication that the appraiser's valuation report is reliable. However, full compliance with USPAP is not the sole measure of reliability. *See Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse I*), 131 T.C. 112, 127–28 (2008),[23] *vacated and remanded on other grounds*, *Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse II*), 615 F.3d 321 (5th Cir. 2010). Here, even if we were to accept the Commissioner's assertions that Mr. Weibel's 2017 appraisal lacks full compliance under USPAP, we would find that these failures go more to the credibility and weight of the appraisal and not to whether the appraisal complies with generally accepted appraisal standards. *See, e.g.*, *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111, at *29. In short, having carefully reviewed the Weibel appraisal and the Commissioner's complaints, we find that the appraisal is not so deficient that it fails to comply with generally accepted appraisal standards. *See J L Minerals, LLC*, T.C. Memo. 2024-93, at *37.

### 2.   *Qualified Appraiser*

Having addressed the Commissioner's arguments with respect to the "qualified appraisal" standard, we turn to the related "qualified appraiser" standard.

Among other requirements, Treasury Regulation § 1.170A-13(c)(3)(i)(B) provides that a qualified appraisal must be "prepared, signed, and dated by a qualified appraiser." A "qualified appraiser" must (1) hold himself out to the public as an appraiser, (2) be qualified to make appraisals of the type of property being valued, and (3) acknowledge that aiding and abetting an understatement of tax liability may subject him to a penalty pursuant to section 6701. Treas. Reg. § 1.170A-13(c)(5)(i). Moreover, a qualified appraiser cannot be one who (1) receives a deduction under section 170 for the contribution of the property that is being appraised, (2) was a party to the donor's acquisition of the property being appraised, (3) is the donee of the property, (4) was a person employed by any of the aforementioned, (5) is related to any of the aforementioned within the meaning of

---

[23] While *Whitehouse I* addresses the admissibility of an expert report rather than whether the report was a qualified appraisal under the Code, we find the case to be illustrative of the subjective nature of appraisals and in stark contrast to the rigid standard of compliance the Commissioner would have this Court adopt, which we refrain from doing here. *See also Buckelew Farm, LLC*, T.C. Memo. 2024-52, at *48.

**[\*33]** section 267(b) (not applicable here), or (6) is an appraiser regularly engaged by any of the aforementioned who does not make most of his appraisals for other persons during the taxable year. Treas. Reg. § 1.170A-13(c)(5)(iv).

The Commissioner does not seem to contest that Mr. Weibel satisfies the requirements of Treasury Regulation § 1.170A-13(c)(5)(i); rather, he seeks to disqualify Mr. Weibel as a qualified appraiser under the theory that he runs afoul of subdivision (ii) of Treasury Regulation § 1.170A-13(c)(5), the so-called knowledge regulation.

Treasury Regulation § 1.170A-13(c)(5)(ii) provides that an appraiser is not qualified if "the donor [here, Seabrook] had knowledge of facts that would cause a reasonable person to expect the appraiser [here, Mr. Weibel] falsely to overstate the value of the donated property."[24] Reading this regulation closely, we observe that it is not the appraisal that may become disqualified, but rather the appraiser. We further observe that the appraiser does not become disqualified simply because (1) the appraiser incompetently or carelessly overstated the value, and/or (2) the donor knew that the appraiser overstated the value, and/or (3) the donor knew facts about the property that caused the value to be overstated. Rather, this disqualification occurs when the donor knows facts that do or should cause him to expect the appraiser to falsely overstate the value. *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at \*42. Such facts will be facts *about the appraiser*, and the resulting expectation is not just an incorrect overstated value but a "falsely" overstated value. *Id.* Thus, Treasury Regulation § 1.170A-13(c)(5)(ii) provides the following as an illustration: "[T]he donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property." Of course, such an agreement would be a fact about the appraiser that is known to the donor; and a valuation known to be in excess of fair market value but agreed to nonetheless would be not just an incorrect amount but a culpably

---

[24] In gauging a partnership's "knowledge," we look to the knowledge of the person(s) with ultimate authority to manage the partnership. *See, e.g.*, *CNT Invs., LLC v. Commissioner*, 144 T.C. 161, 222 (2015) (examining the general partner's knowledge in order to assess "good faith"); *Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 91–92 (2011) (stating that partnership-level defenses take "into account the state of mind of the general partner"), *supplemented by* T.C. Memo. 2012-110, *aff'd*, 728 F.3d 676 (7th Cir. 2013); *see also Jackson Crossroads, LLC*, T.C. Memo. 2024-111, at \*25.

[*34] "false[]" overstatement of value. *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at *42.

In this case, the Commissioner points to facts about the Seabrook property that he says (1) were known to Ms. Belford and the ultimate owners of Manager (Mr. Kiene and Ms. Fedor) and (2) cut against Mr. Weibel's valuation conclusion and ultimately the claimed deduction amount. For example, the Commissioner points to the state of the real estate market in Liberty County during 2017, Ms. Belford's receipt of $4.74 million for a 97% interest in Seabrook in December 2017, and the FLPA covenants that the Commissioner argues were in place on the Seabrook Property at the time of the easement's recordation. The Commissioner argues that knowledge of these facts would cause a reasonable person to expect that Mr. Weibel would provide a falsely overstated valuation. We disagree.

For example, even if the Seabrook Property was subject to the FLPA covenants at the time of the contribution,[25] there is no indication that Mr. Weibel knew of them. Additionally, as we have discussed, these restrictions would not have prevented Seabrook from implementing the proposed development plan—Seabrook could breach them at any time. And the penalty that would have resulted from that course of action would not have materially affected Mr. Weibel's appraisal.

As another example, Ms. Belford's receipt of $4.74 million did not occur until after Mr. Weibel completed his appraisal and there is no evidence that Mr. Weibel was aware of it. Moreover, the Commissioner's expert, Mr. Barber, disclosed in his report the Option Agreement that provided for the payment, but did not make use of the Option Agreement in his analysis of the Seabrook property's value.[26] We will not disqualify Mr. Weibel in these circumstances.

Nor will we do so based on Mr. Kiene's opinions about the general condition of the real estate market in 2017 and the value of the Seabrook Property if used as agricultural land. As we have said, "the expression 'falsely to overstate' is intended to convey a sense of collusion and deception as to the value of the property." *Kaufman v. Commissioner*, T.C. Memo. 2014-52, at *70–71, *aff'd*, 784 F.3d 56 (1st Cir. 2015); *see also Jackson Crossroads, LLC*, T.C. Memo. 2024-111, at *26; *Mill Road*

---

[25] Manager disputes that the restrictions were in fact in place or, alternatively, that any individual believed they were in place; but given the nature of the restrictions, these points are immaterial.

[26] As we describe later, we disagree with Mr. Barber's approach on this point.

**[\*35]** *36 Henry, LLC*, T.C. Memo. 2023-129, at \*42–43. The facts the Commissioner identifies do not establish that any "collusion and deception" was present here.

The Commissioner urges us to apply the relevant authorities more broadly, but, as in *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at \*42–43, and *J L Minerals, LLC*, T.C. Memo. 2024-93, at \*38–39, we decline to do so. The Code elsewhere imposes consequences for overstated value (e.g., disallowance of the overstated deduction) and even for grossly overstated value (e.g., the 40% penalty we discuss below). The regulatory text we construe here is manifestly focused on something beyond that: a taxpayer-donor's knowledge of an appraiser's deception. We see no such knowledge here.

In short, Mr. Weibel was a professional appraiser who held himself out to the public as such, was qualified to appraise property with a coastal residential development plan, is not excluded under the provisions of Treasury Regulation § 1.170A-13(c)(5)(iv), and made the statement acknowledging that he could be subject to penalty pursuant to section 6701. We therefore hold that he was a "qualified appraiser" under Treasury Regulation § 1.170A-13(c)(5).

III.   *Amount of the Deduction*

Having determined that Seabrook met the threshold requirements for claiming a charitable contribution deduction, we now consider the amount of the deduction to which Seabrook is entitled.

A.   *General Principles*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property other than money is the "fair market value" of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369 (11th Cir. 2021). Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *See also Anselmo v. Commissioner*, 757 F.2d 1208, 1213 (11th Cir. 1985), *aff'g* 80 T.C. 872 (1983). "This definition, a fixture in the Treasury Regulations since 1972, is universally acknowledged by professional appraisers when valuing charitable contributions of property." *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at \*27; *see also Value, Black's*

**[\*36]** *Law Dictionary* (4th ed. 1968) (defining "'[v]alue' of land for purpose of taxation" as the "price that would probably be paid therefor after fair negotiations between willing seller and buyer"); Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* 3 (1971) (defining fair market value as "the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obliged to buy").

The fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 ("A determination of fair market value is a mixed question of fact and law: the factual premises are subject to a clearly erroneous standard while the legal conclusions are subject to *de novo* review." (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 994 (11th Cir. 2016), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 2014-79)). The parties have retained experts to assist our inquiry. We evaluate their opinions in light of each expert's qualifications and the evidence in the record, and we may accept an "opinion in toto or accept aspects . . . that we find reliable." *Oconee Landing*, T.C. Memo. 2024-25, at \*58; *see also Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at \*35. We also "may determine fair market value on the basis of our own examination of the evidence in the record." *Savannah Shoals*, T.C. Memo. 2024-35, at \*35; *see also Jackson Crossroads, LLC*, T.C. Memo. 2024-111, at \*35; *Buckelew Farm*, T.C. Memo. 2024-52, at \*51.

In this case we do not have a substantial record of sales of easements comparable to the donated easement. The parties therefore agree that the easement should be valued by calculating the fair market value of the easement property before and after Seabrook granted the easement. *See, e.g.*, *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 ("'[I]f no substantial record of market-place sales is available to use a meaningful or valid comparison,' the 'before-and-after' valuation method is used." (quoting Treas. Reg. § 1.170A-14(h)(3)(i))); *Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 2012 WL 371809, at\*7, *aff'd*, 744 F.3d 648 (10th Cir. 2014). In deciding the "before value," we must take into account not only the actual use of the easement property when the easement was given in December 2017, but also its highest and best use. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369–70;

[*37] *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(ii). Although this "concept 'is an element in the determination of fair market value, . . . it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value.'" *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *47 (quoting *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011)); *see also Corning Place*, T.C. Memo. 2024-72, at *41.

### B.    *Highest and Best Use*

#### 1.    *Legal Principles*

"To determine a property's highest and best reasonably probable use, the court focuses on '[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 996 (quoting *Symington v. Commissioner*, 87 T.C. 892, 897 (1986)); *accord Olson v. United States*, 292 U.S. 246, 255 (1934). We have defined highest and best use as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." *Oconee Landing*, T.C. Memo. 2024-25, at *59 (quoting *Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse III*), 139 T.C. 304, 331 (2012), *supplementing* 131 T.C. 112 (2008), *aff'd in part, vacated in part, and remanded*, 755 F.3d 236 (5th Cir. 2014)); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369–70; *Savannah Shoals*, T.C. Memo. 2024-35, at *37. "The highest and best use inquiry is one of objective probabilities." *Esgar Corp. v. Commissioner*, 744 F.3d at 657.

"While highest and best use can be any realistic, objective potential use of the property, it is presumed to be the use to which the land is currently being put absent proof to the contrary." *Esgar Corp. v. Commissioner*, 2012 WL 371809, at *7. Where "an asserted highest and best use differs from current use, the use must be reasonably probable and have real market value." *Id.* (citing *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)).

If different from the current use, a proposed highest and best use requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985); *see also Savannah Shoals*, T.C. Memo. 2024-35, at *37. Any proposed uses that "depend upon

**[\*38]** events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable" are to be excluded from consideration. *Olson*, 292 U.S. at 257; *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*30; *Oconee Landing*, T.C. Memo. 2024-25, at \*65.

"Where, as here, the parties proposed different uses, we consider '[i]f there is too high a chance that the property will not achieve the proposed use in the near future,' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). "The principle can also be articulated in terms of willingness to pay. If a proposed use is too risky for 'a hypothetical willing buyer [to] consider [the use] in deciding how much to pay for the property,' then the use should not be deemed the highest and best available." *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000 n.14 (quoting *Whitehouse II*, 615 F.3d at 335).

## 2. *Before the Easement*

The parties in this case agree that the highest and best use of the Seabrook property before the easement was granted included some form of residential development. They disagree, however, regarding the kind of residential development.

### a. *Manager's View*

Manager argues that the highest and best use of the Seabrook property before the easement was high-end coastal residential development. In Manager's telling, the Seabrook property's aesthetic characteristics, in particular its marsh views and access to deep water, render it a rare opportunity for development. Manager points out that coastal properties up and down the southeast corridor are in demand, as reflected by high-end developments at Hilton Head, Palmetto Bluff, Kiawah Island, and St. Simons Island. The reason this kind of development had not occurred in Liberty County by 2017, Manager says, is that development generally slowed following the recession in 2008. Moreover, Manager stresses, the Devendorfs owned much of the property in Liberty County that would be suitable for such development and had consistently refused to sell.

In support of this position, Manager points to testimony from Ms. Belford. During her testimony, Ms. Belford recalled offers to purchase portions of the Devendorf property she and her mother

**[\*39]** received over the years, as well as sales of what she views as similar properties along the coast. She spoke about the superior characteristics of the Seabrook property and the sale of 40 acres to Yellow Bluff in 2006. All in all, Ms. Belford is certain that the Seabrook property could and would be developed.

Next, Manager cites reports and testimony from its three experts. The first is Ms. Sward, who testified that the Seabrook property's natural aesthetics and marshland access, coupled with a growing demand for second/vacation homes in the Savannah region, positioned the Seabrook property to be developed and marketed as a modern residential community with an emphasis on health and wellness. From this, Ms. Sward concluded that the Seabrook property "has many characteristics that support its development as a regionally positioned second-home residential community." Ex. 100-P, p. 16.

Another of Manager's experts, Jeff Pate, prepared a conceptual plan to reflect the highest and best use proposed by Ms. Sward. This concept plan proposed that 816 units of various sizes and densities could be developed on the 370 upland acres of the Seabrook property. In addition, the plan proposed amenities such as a village commercial area, a community dock and kayak launch, a fitness center and pool, and a vegetable garden and farm stand. The plan also proposed that more than 100 acres of upland be preserved for natural areas with bike and nature trails, in keeping with Ms. Sward's vision for a health-focused community.[27]

Manager's third expert, Gregory Eidson, prepared a valuation report determining the value of the Seabrook property. As part of the report, Mr. Eidson concluded that the highest and best use of the property was vacant land that could be developed as a master planned residential development. Mr. Eidson relied significantly on Ms. Sward's market analysis in reaching this conclusion. He further noted that the property's location, topography, and size could accommodate a wide variety of uses. While the property was not zoned for a master planned development at the time the easement was granted, Mr. Eidson found it reasonably probable that Liberty County would approve a request to change the zoning. With regard to financial feasibility, Mr. Eidson noted the desirability of the property's location on a marsh, as well as the fact that "[p]rimary and secondary home sites have increased." Ex. 102,

---

[27] Mr. Pate testified that he relied on the highest and best use conclusion reached by Ms. Sward.

**[\*40]** p. 81.   And he asserted that residential development is the maximally productive use of the property "[b]ased upon the subject's size, location, and demand in the market." *Id.*

b.      *Commissioner's View*

The Commissioner disagrees that the kind of development Manager envisions would be feasible for the Seabrook property.  In particular, the Commissioner points to the rural nature of Liberty County and the lack of any amenities to draw to the area the type of buyer Ms. Sward describes.  According to the Commissioner, the Seabrook property, while ecologically important, was not beachfront or coastal property.  He further argues that the Seabrook property was in a "remote area" east of I–95 and that it was not zoned for higher density development.  Another problem, the Commissioner says, was that the lack of access to public water and sewer, as well as roads and other utilities, would prevent anything other than very low-density development on the property.  Further, he speculates, the existence of protected species and potential archeological sites on the property would have posed additional impediments.

In support of his view, the Commissioner relies on the testimony and report of his valuation expert, Mr. Barber.  In his retrospective appraisal of the Seabrook property, Mr. Barber concluded that the highest and best use of the Seabrook property was for "interim use of the recreational timberland/upland with the potential for large acreage rural residential development with private water wells and a septic sewer system." Ex. 200-R, p. 73; Resp't's Op. Br. 131.  Regarding the physical possibility of his proposed use, Mr. Barber observed that, while the property includes wetlands, there is enough high ground to support some development and that paved road access and overhead electricity were available on the west side of the property.  Regarding legal permissibility, Mr. Barber noted that A–1 Agricultural zoning allows for only minimal residential, but that rezoning could potentially be achieved to facilitate heavier development.  Regarding financial feasibility and maximum productivity, Mr. Barber said that, while the property is within the Savannah-Hinesville-Statesboro, GA Combined Statistical Area, it is outside city limits.  He elaborated at trial that he did not believe buyers would drive the 20 to 30 miles from population centers to the Seabrook property for small lots along the lines Mr. Pate had proposed, but that they potentially would travel for larger acreage farms or ranchettes.

[*41] In contrast to Manager's proposed use, the Commissioner says, Mr. Barber's proposed use was consistent with existing zoning and supported by the lack of successful residential development east of I–95 in Liberty County, as well as the relatively low value placed on other large undeveloped tracts of land nearby. The Commissioner notes that, leading up to 2017, larger density developments in Liberty County either failed or were west of I–95, where Hinesville and Fort Stewart are. The Commissioner further points to unsold lots in Yellow Bluff, the closest development, at the time of trial, and the lack of grocery stores, restaurants, hospitals, and schools near the Seabrook property. All these factors, the Commissioner contends, show that the Seabrook property could not have reasonably supported higher density development.

c. *Analysis*

The Commissioner's points are not without merit. For example, we agree that the location of the Seabrook property in a rural part of Liberty County rather than in Chatham County (where Savannah is), Glynn County (where St. Simons is), or even neighboring Bryan County, is significant. Further, we question the reasonableness of the high-density Pate plan, which contemplates more people than the entire population of Midway (the closest city in Liberty County) living on the property, and which, among other issues, failed to provide for adequate roads, water, or sewage treatment facilities on the property.[28]

With that said, we view these points as more relevant to later portions of the valuation analysis, such as the selection of a valuation method (e.g., income versus cost or comparable sales) and potential comparable properties, rather than the highest and best use determination. For present purposes, it suffices to say that we agree with Manager that the highest and best use of the Seabrook property was residential development, unconstrained by the qualifiers the Commissioner would place on that concept. The Seabrook property is picturesque, with beautiful trees, marsh views over parts of the property, and deep water access. It is approximately 45 minutes from Savannah and closer to Hinesville and Bryan County. That and its location on Fort Morris Road, only four miles from I–95, indicate that the property was not so remote as to deter all potential buyers. Its zoning would have supported one-acre lots on the upland portion of the property, and we are convinced that Seabrook could have obtained a

---

[28] We discuss these issues at greater length below.

[*42] zoning change if it had sought one. So we do not believe that Seabrook's highest and best use would have been constrained to "large acreage rural residential development," as the Commissioner contends.

### 3. *After the Easement*

Seabrook and the Commissioner are in agreement that the highest and best uses of the Seabrook property after the easement was granted were recreation and agriculture. We agree with this mutual determination and do not discuss the issue further.

### C. *Valuation of the Easement*

### 1. *Legal Principles*

Having determined the highest and best use of the property, we next turn to determining its value before the grant of the easement.

We typically draw on one or more of three common approaches to determine the fair market value of a piece of real property: (1) the market, or comparable sales, approach; (2) the income approach; and (3) the cost, or an asset-based, approach. *See, e.g.*, *Excelsior Aggregates*, T.C. Memo. 2024-60, at *32; *see also Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Our decision on which approach (or approaches) to use is a question of law, and the utility of the various approaches can vary based on the type of property at issue. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013); *see also Corning Place*, T.C. Memo. 2024-72, at *31–32; *Savannah Shoals*, T.C. Memo. 2024-35, at *35–36.

In addition, and unsurprisingly, "[t]his Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods." *Buckelew Farm*, T.C. Memo. 2024-52, at *56; *see also J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, at *55; *Corning Place*, T.C. Memo. 2024-72, at *28; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31 ("The best evidence of a property's [fair market value] is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date."); *ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at *14. For these purposes, both we and the U.S. Court of Appeals for the Eleventh Circuit have "f[ou]nd the purchase [of a partnership

**[\*43]** interest] reflective of the price that the market would pay for the Subject Property, especially when the ownership interest was nearly 100% and the only asset held by the Partnership was the Subject Property itself." *Buckelew Farm*, T.C. Memo. 2024-52, at \*56; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368 (finding that the sale price for a 98.99% interest in a partnership, whose only meaningful asset was property on which an easement was granted shortly thereafter, was representative of the "before" value of the property); *Oconee Landing*, T.C. Memo. 2024-25, at \*71–72.

The various approaches and the value indicated by previous sales provide a valuable sanity check for each other. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at \*32.

2. *Analysis*

In this case, the parties both rely on the comparable sales approach to value the conservation easement. Manager also relies on the income approach to support its conclusion, while the Commissioner invokes (1) the amount Ms. Belford received in exchange for her 97% interest in Seabrook, whose only material asset at the time was the Seabrook property,[29] and (2) the amount of capital raised by InvestCo to facilitate the easement transaction.

We note at the outset that valuing the Seabrook property is not a straightforward exercise. As Manager points out, it is an aesthetically pleasing parcel with desirable natural amenities. Few property sales nearby reflect similar attributes, in part because the Devendorfs long controlled 9,600 acres of land in Liberty County, mostly east of I–95. And it is difficult to draw persuasive comparisons to parcels farther afield in more developed areas, because the Seabrook property's remote and rural location bears significantly on its value.

Compounding the difficulty, the appraisals offered by the experts for each party shade towards advocacy. *See Zarlengo*, T.C. Memo. 2014-161, at \*45 ("Experts lose their usefulness and credibility when they merely become advocates for the position argued by a party." (citing *Laureys v. Commissioner*, 92 T.C. 101, 129 (1989))). For his part, Mr. Barber, the Commissioner's expert, gives short shrift to the natural features of the Seabrook property and therefore undervalues it. By contrast, Mr. Eidson, Manager's expert, focuses overmuch on these

---

[29] Seabrook also had recorded a $1,000 receivable from Manager on its books.

[*44] amenities and ignores the disadvantages of the property's location in Liberty County. The Seabrook property is not in or next to Savannah, Palmetto Bluff, St. Simons, Charleston, Jacksonville, or any of the other desirable and densely populated areas Mr. Eidson invokes. And possession of some pleasant aesthetic features is not enough to transform the Seabrook property into a high-end destination for vacationers and homebuyers.

In these circumstances, we cannot adopt the findings of either expert. Instead, we value the property based on our own examination of the record. *See Buckelew Farm*, T.C. Memo. 2024-52, at *51; *Savannah Shoals*, T.C. Memo. 2024-35, at *35. As described further below, we rely on three sales of comparable properties from Mr. Barber's analysis, adjusted in accordance with Mr. Eidson's methodology. We also find Ms. Belford's actual transaction with respect to the Seabrook property to be a useful indicator of value that supports our analysis. We place no weight on the parties' remaining comparable property sales or on Manager's analysis under the income approach.

a. *Comparable Sales Approach*

The comparable sales approach "values property by comparing it to similar properties sold in arm's-length transactions around the valuation date." *Savannah Shoals*, T.C. Memo. 2024-35, at *36 (first citing *Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); and then citing *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979)); *see also Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 987. "Because no two properties are ever identical, the appraiser must adjust the sale prices of the comparables to account for differences between the properties (e.g., parcel size, location, and physical features) and the terms of the sales (e.g., proximity to valuation date and conditions of sale)." *Savannah Shoals*, T.C. Memo. 2024-35, at *36 (citing *Wolfsen Land & Cattle Co.*, 72 T.C. at 19); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at *33. The reliability of a comparable sales analysis depends on the comparability of the properties selected as comparables and the reasonableness of the adjustments made to the prices to establish comparability. *Wolfsen Land & Cattle Co.*, 72 T.C. at 19–20.

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation.'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24); *see also J L Minerals, LLC*, T.C. Memo. 2024-93,

**[\*45]** at \*58; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*38; *Savannah Shoals*, T.C. Memo. 2024-35, at \*35. "The comparable sales approach is usually the most reliable indicator of value when sufficient information exists" because "'the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers.'" *Corning Place*, T.C. Memo. 2024-72, at \*32 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24).

Both parties offered comparable sales analyses based on proposed sets of comparables. As we have said, we find the approaches of both experts problematic. We discuss our concerns in greater detail below and also highlight the few comparables we found useful to our analysis.

### i. *Mr. Eidson's Approach*

Having concluded that the highest and best "before" use of the Seabrook property was a master planned residential development, Manager's expert, Mr. Eidson, selected properties that mostly were used (or intended to be used) for the same purpose. Citing a lack of adequate comparables for the Seabrook property nearby, Mr. Eidson selected seven comparables that span a vast area of the southeast. Their locations include Davenport (near Orlando) and Jacksonville, Florida, Forsyth and St. Simons Island, Georgia, New Hill and Charlotte, North Carolina, and Charleston, South Carolina. More significantly, all are in populated areas with numerous amenities nearby to attract buyers. (In one case, for example, the comparable is in a densely populated area 30 minutes from Disney World.) For five of the seven comparables, Mr. Eidson rated the location "inferior" to the location of the Seabrook property in Liberty County, and so adjusted their prices upward by 5%. He made a further 30% upward adjustment to each of the same properties to account for the fact that, unlike the Seabrook property, the properties had no water frontage. For the remaining two properties, which were on the coast in Mount Pleasant, South Carolina (near Charleston), and St. Simons Island, Georgia, Mr. Eidson applied a negative adjustment of 10% to account for the superior locations of the properties. Mr. Eidson made other adjustments to his seven comparables to account for differences in topography, the availability of utilities, and the year of sale. He made no adjustments to account for differences in size, even though each of the properties except comparable 7, on St. Simons Island, was significantly smaller than the Seabrook property.

**[\*46]** One other aspect of Mr. Eidson's approach bears mentioning. Mr. Eidson initially reported the unadjusted price for each comparable sale as well as the overall acreage and price per acre. But he did not provide an adjusted price per acre or even an overall adjusted price. Instead, he calculated an unadjusted price *per unit* for each comparable based on the number of units planned for or built on the property. Then he adjusted the price per unit in several stages. The resulting adjusted range is from $33,779 per unit to $42,277 per unit, while the unadjusted range is from $23,000 per unit to $47,008 per unit. Mr. Eidson opined that Seabrook was most similar to the higher end comparables he chose (comparable 1, in Charleston, and comparable 7, in St. Simons Island), and so settled on a final reconciled price per unit of $39,500. Multiplied by 816 units, this produced Mr. Eidson's estimated price of $32,232,000.

By comparison the unadjusted price per acre ranged from $26,223 per acre to $73,974 per acre, with an average of $47,806 per acre. The adjusted price per acre (calculated by multiplying the adjusted price per unit by the number of units and then dividing by total acres) ranged from $29,139 per acre to $85,419 per acre, with an average of $60,552 per acre.

ii.     *Mr. Barber's Approach*

Mr. Barber chose six properties, which he labeled comparables 1, 2, 3, 4, 5, and 7. All the comparables were in Georgia, and all the sales took place from 2015 to 2017. Information regarding each comparable is as follows:

- Comparable 1:  This sale was an auction sale that involved a 379.76-acre parcel in Liberty County.[30] The parcel was just west of I–95 at the intersection of I–95 and highway 84, with frontage on both. The parcel was zoned PUD. It had timber and some wetlands and appears to have also had several ponds. The parcel was sold on September 30, 2016, for $1.75 million, or $4,608 per acre. It had no marsh, river, or creek frontage.

- Comparable 2:  This sale involved a 151.02-acre parcel in Liberty County. The parcel was in Flemington, Georgia, adjacent to Hinesville and Fort Morris. The property was zoned PUD and had city utilities. It has since been developed into a small-lot residential development.  The property was a vacant pine

---

[30] The parcel was owned by a financial institution.

**[\*47]** plantation at the time of purchase. The parcel was sold on December 27, 2017, for $725,000, or $4,801 per acre. It had no marsh, river, or creek frontage.

- Comparable 3: This sale involved a 273.57-acre parcel in Bryan County just south of Richmond Hill.[31] The parcel was east of I–95 with frontage on the interstate. The parcel was zoned AR–1 and was vacant timberland at the time of sale. It has since been converted into a small-lot residential development. The parcel was sold on September 10, 2015, for $2,017,900, or $7,376 per acre.

- Comparable 4: This sale involved a parcel in Bryan County east of I–95 and Richmond Hill. It was zoned PUD and was a portion of a mixed residential and commercial development. The parcel was sold on December 4, 2015. Conflicting evidence presented at trial leaves us unable to determine its acreage and, as a result, a per-acre price for the sale, as well as other relevant details.

- Comparable 5: This sale involved a 253.5-acre parcel in Chatham County. The parcel was along the south side of Highway 204 just west of Savannah. It was zoned R–A (Residential Agriculture). The property had significant marsh acreage (approximately 100 acres) and frontage along the Ogeechee River. It contained several bodies of water and consisted almost entirely of wetlands. It was entirely within the flood plain. The parcel was sold on April 16, 2015, for $570,000, or $2,249 per acre.[32]

- Comparable 7: This sale involved 1,567.28 acres in Liberty County. The total acreage consisted of two noncontiguous parcels, both highly irregular in shape. One parcel was roughly a horseshoe shape that appears to have tracked the boundaries of a wetland, such that the entire parcel was wetland. The other parcel also had significant wetland. The parcels were directly across from a paper mill and not far from Seabrook, west of I–95. They were zoned A–1 Agricultural and DM–1 Dunes and Marshland. Approximately 497.78 acres of the total acreage was

---

[31] One page of Mr. Barber's report reflects a transposed number of 257.53 acres, but it is clear from the context that the correct number is 273.57.

[32] This amount assumes no adjustment for marsh acreage. Mr. Barber calculated an alternative price of $2,932 per acre by valuing the 100 acres of marsh at $1,200 per acre ($120,000) and dividing the remaining $450,000 among the remaining 153.5 acres.

**[*48]** marshland. The parcels also had creek frontage and varying stands of pine and hardwood. The parcels were sold on December 30, 2015, for $3,475,000, or $2,217 per acre.[33]

Mr. Barber did not make any adjustments to the comparables to account for their differences from the Seabrook property. Instead, he ranked the properties as either inferior, similar, or superior to the Seabrook property. He deemed comparable 1 to be similar, comparables 2, 3, and 4, to be superior, and comparables 5 and 7 to be inferior. Using these rankings, along with the per-acre mean ($4,685) and median ($4,705), he selected a value of $4,700 per acre for the upland portion of the Seabrook property. For the marshland, he selected a value of $1,200 per acre based on several benchmarks described in the report. This resulted in a total estimated value of $2,060,000 for the Seabrook property.

Mr. Barber also looked at two sales after 2017 to bolster his proposed valuation. Because we do not find those sales useful, we do not discuss them further.

### iii. *Analysis*

We find the approaches of both experts deficient in significant respects.

#### a) *Concerns with Mr. Eidson's Approach*

Mr. Eidson, for his part, ignores real estate's oldest adage: "Location, location, location." Yes, the Seabrook property possesses some desirable aesthetic characteristics. But it is also in a largely rural county. The Seabrook property is a 45-minute drive from downtown Savannah, and much of the area between the two locations is undeveloped. The Seabrook property is about 30 minutes from Hinesville and about 20 minutes from Richmond Hill. The closest city, Midway, Georgia, has a population of only 2,200. The closest economic area is an industrial zone about three miles away that hosts a Target distribution center and other industrial buildings.

---

[33] Again, this amount assumes no adjustment for marsh acreage. Mr. Barber calculated an alternative price of $2,691 per acre by valuing the 497.78 acres of marsh at $1,200 per acre ($597,336) and dividing the remaining $2,877,664 among the remaining 1,069.5 acres.

**[\*49]** In view of these facts, it is perhaps unsurprising that there are few commercial amenities near the Seabrook property that would attract buyers to the location. There are no restaurants, shops, schools, hospitals, country clubs, golf courses, resorts, or other similar draws nearby to make people want to live or vacation there. Essentially, there is nothing other than the characteristics of the property itself, and Mr. Eidson leans heavily on those attributes.

Pleasant aesthetics, however, do not render the Seabrook property comparable to properties in and around major cities such as Jacksonville, Charlotte, and Charleston, as Mr. Eidson contends. As an illustration, in Ms. Sward's rebuttal expert report, Seabrook presented a heat map demonstrating the price of real property in different areas of the southeast United States. Ms. Sward invoked the map to show that property east of I–95 generally sells at higher prices than property west of I–95. But what it actually shows is that properties in population centers (e.g., Atlanta, Charleston, and Savannah) command much higher prices than those in rural areas. This makes perfect sense; greater demand exists in areas with more people and economic activity, because buyers value living near their places of work, schools, shopping, restaurants, and other amenities. The supply of such property is also limited, further driving up prices.

Consistent with these observations, despite Manager's arguments about the value of coastal property relative to property west of I–95, the highest prices for real property in Liberty County (reflected in Ms. Sward's heat map in red and orange) are in Hinesville, miles west of I–95. Again, this makes sense; Hinesville is Liberty County's largest city and its county seat and is adjacent to Fort Stewart, the county's largest employer by far. By contrast, Ms. Sward's heat map depicts the area east of I–95 in Liberty County, where the Seabrook property is located, mostly in green, indicating lower prices.[34]

---

[34] Two 2017 sales in Liberty County offer a stark illustration of this dynamic. The first is Mr. Barber's comparable 2, located just outside Hinesville in a previously undeveloped area. The property was PUD-zoned and sold for $4,801 per acre. In the same year, according to evidence the Commissioner introduced at trial, a second PUD-zoned property of approximately the same size, located nearby at Hinesville's city limit, sold for $16,021 per acre. The second property was closer to other development and had frontage on Highway 84. Exs. 148-R, 149-R, 207-R (Sale I), Tr. 1112, L. 11-15. And while other factors, such as an option agreement simultaneously executed by the buyer and the seller, may have influenced the price for the second sale to some degree, its more favorable location undoubtedly was significant.

**[\*50]** Given the Seabrook property's location, none of the properties Mr. Eidson identified is sufficiently comparable to the Seabrook property. They are all in developed areas, in most cases in or near major population centers or well-known vacation destinations. To put it in terms of Ms. Sward's map, the proposed comparables are in red and orange zones. Moreover, they are close to restaurants, shopping, and other commercial amenities, and in some cases to golf, resorts, and beaches. One comparable was quite literally down the road from Disney World.

Mr. Eidson's analysis did not adequately adjust for these extreme differences in location. In fact, in five out of seven instances, Mr. Eidson determined that his comparables, which were in developed areas in or near population centers with high property values (e.g., Charlotte and Orlando), were in locations *inferior* to that of the Seabrook property and so adjusted their prices up. Mr. Eidson, in other words, attributed no value to the red and orange locations of the comparables. Instead, he rated the Seabrook property's location as superior. This determination is simply not justified by the record.[35]

With respect to Mr. Eidson's remaining two comparable properties, in Mt. Pleasant, South Carolina, and St. Simons Island, Georgia, Mr. Eidson acknowledged their superior locations and adjusted their prices down by 10%. But this adjustment was not nearly enough. St. Simons Island is a high-end vacation destination on the Georgia coast. Its offerings include beaches and luxury resorts, restaurants, and shopping. Golf courses abound, as do expensive homes, and Mr. Eidson's comparable was part of this community. Similarly, Mt. Pleasant is an island suburb of Charleston, just across the river from the city. It is on the water and densely populated, with retail, shopping, groceries, and other typical amenities. In no way does a 10% adjustment account for the difference between this location—or St. Simons Island—and Liberty County.

The Seabrook property's marsh and water frontage is no defense on this score, because Mr. Eidson adjusted separately for those attributes. Specifically, for the five out of seven comparables that had no marsh or water access, he made a further 30% adjustment in Seabrook's favor to compensate for the difference. For the St. Simons

---

[35] Mr. Eidson supports his adjustment by comparing estimated prices for lots in a hypothetical Seabrook development with actual prices for lots in the comparable communities. This too is unsupportable, for the reasons we explain when discussing Mr. Eidson's income analysis.

[*51] Island and Mt. Pleasant properties, both of which Mr. Eidson rated as similar to Seabrook in this regard, he made no adjustment.[36]

In short, Mr. Eidson's approach strikes us in multiple respects as directed at generating a high valuation for the Seabrook property rather than performing an accurate appraisal. For these reasons, we reject Mr. Eidson's comparable sales analysis except for parts of his adjustment methodology, which we apply to certain of Mr. Barber's comparables as we describe further below.

b) *Concerns with Mr. Barber's Approach*

On Mr. Barber's side, we agree with Manager that Mr. Barber's report does not give adequate weight to the aesthetic characteristics of the Seabrook property, such as its mature oak trees, marsh views, and water access. Mr. Barber appears to recognize that those characteristics have value and would make the Seabrook property more attractive for development. He acknowledged in his testimony that water frontage and marsh views can significantly affect a property's value. But he made no adjustments to his comparables to account for the absence of these important characteristics. And we are not convinced that Mr. Barber's ranking of comparables from highest to lowest value was sufficient to account for this deficiency. This is particularly the case given that the comparables Mr. Barber proposed that did have water or marsh frontage also had some of the lowest per-acre values, apparently because they were not developable (e.g., because they were entirely wetland) or were undesirable for another reason (e.g., being located next

---

[36] As a final critique of Mr. Eidson's analysis, we note that his method of valuing parcels by unit rather than by acre disguises the fact that, on a per-acre basis, his comparables do not appear to support the value he reached for the Seabrook property, even with the questionable adjustments we describe above. This becomes apparent when one considers that nearly half of the Seabrook property was marsh, resulting in a valuation of almost $100,000 per upland acre. Mr. Eidson does not break down buildable versus unbuildable acres for each of his comparables, but, with one or two exceptions, Mr. Eidson's comparables appear to have much higher percentages of buildable acreage than the Seabrook property. Accordingly, when applied to the Seabrook property's buildable acres, the values Mr. Eidson determined would in most cases fall short of justifying the prices he determined. When pressed on this point at trial, Mr. Eidson insisted that a per-unit analysis was correct, that he always uses it, and that a per-acre analysis does not make sense for residential development. But in his only other conservation easement appraisal case, Mr. Eidson concluded a highest and best use of residential development for a property located in Georgia, and he used a per-acre basis for his valuation conclusions. *See Butler v. Commissioner*, T.C. Memo. 2012-72, 2012 WL 913695, at *19.

[*52] door to a paper mill). The property that Mr. Barber viewed as more comparable to the Seabrook property, pricewise, did not have water or marsh frontage. And we do not agree with Mr. Barber that its more valuable attributes (e.g., a location closer to I–95 and population centers) would have fully offset this lack.

In addition, while Mr. Barber's comparables have the benefit of being located in areas closer and more similar to the Seabrook property, some of them have other fatal deficiencies. We reject comparable 4, for example, because of conflicting evidence in the record that leaves us unable to calculate a per-acre price for its December 4, 2015, sale, as well as other key information. Comparable 5 we reject because the underlying parcel was nearly all wetland and water, and, as a result, likely could not have been developed. (This explains its extremely low price notwithstanding its water and marsh front location close to Savannah.) Comparable 7 we reject because of its highly irregular shape and the predominance and location of wetlands on the property, all of which render it unsuitable for the kind of development that the Seabrook property could support.[37]

c)    *Our Analysis*

Mr. Barber's remaining three sales, however, are more helpful, and we employ them in our own analysis. Comparable 1 was close to Seabrook, albeit west of I–95, and was zoned PUD, indicating that it was suitable for development. Comparable 2 was in Liberty County and was actually developed into a small-lot residential development. Comparable 3 was in adjacent Bryan County, was east of I–95, and also was developed into small residential lots. All three comparable sales took place between late 2015 and late 2017.

Manager raises objections with respect to each of these comparables. All three comparables, it says, lack the water access and marsh frontage that made the Seabrook property so valuable. Additionally, Manager says, all three are in higher chance flood zones than the Seabrook property. (Presumably Manager here refers to the Seabrook property's upland acres rather than the marsh.) With regard to comparable 1, Manager argues that its status as an auction sale would have reduced the price paid for the property below its fair market

---

[37] While we cannot determine precise percentages, the map in Mr. Barber's report suggests that 80% or more of the property is wetland, with the remaining 20% segmented into smaller, irregular plots by the property's shape and the location of the wetlands.

[*53] value.  And it speculates that comparable 2 appears to be an heirs property, which it says would similarly reduce the price.

Some of these objections are reasonable, but of course no property will be perfectly comparable.  And Manager's own expert, Mr. Eidson, proposed adjustments to address similar issues.  We therefore adopt the three comparables in our analysis, applying adjustments that are the same as or similar to the ones that Mr. Eidson proposed.  For example, we will adopt his 30% adjustment to account for the lack of water and marsh access.  We also will adjust for time of sale, reflecting an increase in property values of 5% per year, as Mr. Eidson did.  Finally, we will adjust for location, again using Mr. Eidson's methodology.  Mr. Eidson adjusted his proposed comparables up or down by 5% or 10% to reflect their inferior or superior locations as compared with the Seabrook property.  We will do the same, adjusting comparable 1 and comparable 2 up by 10% to account for the Seabrook property's pleasant aesthetics and location east of I–95, closer to the coast.  We will adjust comparable 3 down by 5% because it too is east of I–95 and its location near the city of Richmond Hill, materially closer to Savannah than the Seabrook property, more than offsets any other aesthetic characteristics of the Seabrook property.  Applying these adjustments yields the following results.

|  | *Comparable 1* | *Comparable 2* | *Comparable 3* |
|---|---|---|---|
| Date of transaction | September 30, 2016 | December 27, 2017 | September 10, 2015 |
| Price (unadjusted) | $1,750,000 | $725,000 | $2,017,836 |
| Acreage | 397.76 | 151.02 | 273.57 |
| Price per acre (unadjusted) | $4,608 | $4,801 | $7,376 |
| Time adjustment (5% per year) | +6.25% | +0% | +11.25% |
| Location adjustment | +10% | +10% | −5% |
| Water / marsh adjustment | +30% | +30% | +30% |
| Price per acre (adjusted) | $7,002 | $6,865 | $10,134 |

**[\*54]** These adjustments are sufficient to account for Manager's complaints regarding the comparables. With respect to water and marsh access, we apply the same adjustment that Manager's expert did. Regarding the flood plain, for comparables 1 and 2 we have provided a 10% adjustment in Seabrook's favor, crediting the Seabrook property with a superior location. We applied a negative 5% adjustment to comparable 3; but given its superior location in Richmond Hill, essentially halfway between the Seabrook property and Savannah, we view that adjustment as generous to Manager. Additionally, comparable 2 and comparable 3 have both been developed into small-lot residential developments and comparable 1 is zoned PUD, indicating its suitability for development.

We further note that our use of a price per total acre, as opposed to a price per upland acre, is in Manager's favor. Recall that approximately 42% of the Seabrook property is marsh and wetland. The maps in Mr. Barber's report indicate that comparables 1, 2, and 3 each have wetlands as well, but that the proportion of nonbuildable acreage overall is less than that of the Seabrook property.[38] Rather than attempting further adjustments to account for this discrepancy, we note it as another mechanism by which Manager has been adequately compensated for any differences in the flood plain.[39]

With respect to Manager's objections on the auction sale for comparable 1 and the suspected heirs sale for comparable 2, we are not persuaded. Regarding comparable 2, Manager has not established that the sale was in fact an heirs sale. And even if it were, Manager has not cited any authority that would require us to adjust the sale price in such circumstances. Regarding comparable 1, it is true that the Supreme Court has questioned the utility of forced sales in determining fair market value. *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537–38 (1994) ("[M]arket value, as it is commonly understood, has no applicability in the forced-sale context . . . ."); *see also Redus Fla. Com., LLC v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187, 1195 n.15 (11th Cir. 2014) ("The problem is that 'fair market value' has nothing whatsoever to do with the value received at public auctions."). But Manager has not shown

---

[38] Comparable 1 appears to be approximately one-third water or wetland, while comparable 2 contains hardly any wetland. Comparable 3 appears to have wetlands in a proportion less than or similar to the Seabrook property.

[39] We similarly refrain from adjusting for utilities because we lack sufficient information to make reliable adjustments. This too is in Manager's favor, because all three of the comparables appear to have had utility access superior to that of the Seabrook property.

**[\*55]** that comparable 1 was a forced sale. Moreover, Mr. Barber acknowledges that the sale was an auction sale but says that "[i]nterviews with local brokers and appraisers confirmed that adequate market exposure and advertising were more than enough to support as fair market value." Ex. 200-R, p. 122. Based on our review of the entire record, including the very similar price for comparable 2, we believe Mr. Barber's representation in this regard. *See Oconee Landing*, T.C. Memo. 2024-25, at \*69 n.30. Comparables 1 and 2 both involved properties west of I–95 in Liberty County and occurred within 15 months of each other. That a financial institution was the seller for comparable 1 does not show that the sale was for less than fair market value. Moreover, even if we were to exclude comparable 1 from our analysis, the result would be the same, as we discuss further below.

In addition to objecting to the comparables Mr. Barber chose, Manager alleges that his search was one-sided and incomplete, missing a large number of potential comparables that show much higher per-acre values. In support of this allegation, Manager submitted a long list of potential comparables located by its rebuttal expert that purportedly met Mr. Barber's search criteria but did not appear in his report. It also submitted emails Mr. Barber received regarding certain properties in Glynn County.[40]

After carefully reviewing this evidence, we find little to support Manager's position. Most of the 80 additional comparable sales listed in Manager's brief involve properties in Chatham County, near or in Savannah. Some were "under contract" rather than completed sales. A few of the completed sales were in Bryan County and one was in Camden

---

[40] At trial, the Commissioner objected to the admission of certain of Manager's evidence on this score for anything other than impeachment purposes—specifically, Exhibits 359-P, 362-P, 363-P, 364-P, 365-P, 366-P, 368-P, 369-P, and 370-P. We directed the parties to provide argument on this issue in their briefs. The Commissioner did not do so in his Opening Brief and therefore has conceded the issue. *See, e.g.*, *Giambrone v. Commissioner*, T.C. Memo. 2024-47, at \*19; *see also Bank of Am., N.A. v. Mukami* (*In re Egidi*), 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Ashkouri v. Commissioner*, T.C. Memo. 2019-95, at \*24 n.9 ("Having conceded an issue by failing to advance a meaningful argument on that issue in their opening brief, [the taxpayers] could not withdraw that concession by belatedly including a cognizable argument in their reply brief."). Accordingly, we admit the exhibits.

[*56] County. Only two were in Liberty County.[41] Moreover, we did not find any of the underlying properties to be comparable. Many of them were industrial or commercial, or had improvements and/or were shovel ready.[42] Moreover, Manager's supplementary evidence was one-sided by design—its expert searched only for properties with values over $35,000 per acre.

It is telling that, of the 11 potential comparables outside the expert reports that Manager characterizes as "[t]he most notable of the record's valuation information," 5 are pre-recession sales, 4 are listings (so not sales at all), and 1 is a sale from 2021, almost four years after the easement was contributed. Only one of the potential comparables, involving 38.3 acres on Sunbury Road, was a sale close in time to Seabrook's easement contribution. That sale was for $2.5 million ($65,274 per acre) on January 30, 2017. Seabrook characterizes the underlying parcel as a "future development site" and as a "parcel[] that sold for residential development," repeatedly chastising Mr. Barber for overlooking it. Pet'r's Op. Br. 163, 184. But, in actuality, the parcel was in a developed industrial park, the same one that houses the Target Distribution Center, one of the largest employers in Liberty County. As Manager's own exhibit reports, the sale was of "industrial land" at "Building D Pad Site – Tradeport East Business Center" after 1,707 days (almost five years) on the market. Ex. 301-P, p. 236. The parcel had all utilities available and was purchased because "[t]he buyer owns the adjacent property and the current tenant is looking to expand." Ex. 301-P, p. 237. In other words, the parcel was shovel ready and sold only when the buyer needed it to satisfy an existing tenant's requirements. Thus, it was not remotely comparable to the Seabrook property, and Mr. Barber did not err in excluding it. Nor did he err in overlooking the other supposed comparables Manager invokes.

---

[41] Similarly, a separate table Manager compiled to show "parcels that sold for residential development in the Savannah-Hinesville-Statesboro Combined Statistical Area ('CSA'), the same CSA where the Devendorf [p]roperty is located," includes 14 total properties. Pet'r's Op. Br. 163–65. Ten of the properties are in Savannah proper, three are in Pooler, a suburb adjacent to Savannah, and one is the Sunbury Road property discussed directly below. None of the properties is larger than 55 acres and 11 of them are smaller than 25 acres. In other words, they are not comparable to the Seabrook property and tell us nothing about its value.

[42] For example, one of the two Liberty County sales involved a relatively small (15.91-acre), shovel-ready commercial lot on Highway 84 that was used to develop a shopping plaza. Similarly, the other Liberty County sale involved a shovel-ready industrial lot (the Sunbury Road sale) that we discuss in more detail shortly.

**[\*57]** We observe in closing that all three of the adjusted comparable prices are fairly close to the price per acre that Ms. Belford received in her transaction with InvestCo. We reconcile the prices and determine a final "before value" for the Seabrook property in Opinion Part III.C.3 below, after we discuss Mr. Eidson's analysis under the income approach and Ms. Belford's transaction.

b.    *Income Approach*

The income method values a property by computing the present value of projected future income from the property. *Chapman Glen Ltd.*, 140 T.C. at 327; *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision); *see also J L Minerals, LLC*, T.C. Memo. 2024-93, at \*60; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*33; *Savannah Shoals*, T.C. Memo. 2024-35, at \*36. "The theory behind an income approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income." *Savannah Shoals*, T.C. Memo. 2024-35, at \*36 (citing *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, *aff'd*, 493 F. App'x 944 (10th Cir. 2012)); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at \*33.

"The income capitalization [approach] is most reliable when used to determine the value of an existing business with a track record of income, expenses, profits, and growth rates. A historical track record provides real-world inputs that supply a plausible basis for projecting future revenue." *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*43–44 (citing *Whitehouse III*, 139 T.C. at 325 (noting that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings")); *see also J L Minerals, LLC*, T.C. Memo. 2024-93, at \*61.

"Income valuation methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable." *Savannah Shoals*, T.C. Memo. 2024-35, at \*36; *see also Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–44 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*33. "The income approach is rarely appropriate when seeking to determine the value of undeveloped property with no existing cashflow." *Corning Place*, T.C. Memo. 2024-72, at \*37; *see Excelsior Aggregates*, T.C. Memo. 2024-60, at \*44 ("[C]ourts have often noted 'the folly of trying to estimate the value of undeveloped property by looking

**[*58]** to its anticipated earnings.'" (quoting *Pittsburgh Terminal Corp v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision))); *see also Chapman Glen, Ltd.*, 140 T.C. at 327; *Whitehouse Hotel III*, 139 T.C. at 324–25; *Ambassador Apartments*, 50 T.C. at 243–44; *Savannah Shoals*, T.C. Memo. 2024-35, at *36. "Absent a financial track record, every input into the DCF analysis necessarily involves speculation." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *44; *see also Winooski Hydroelectric Co. v. Five Acres of Land*, 769 F.2d 79, 82 (2d Cir. 1985) ("On the most basic level, the future income calculations were too speculative, since Green Mountain had not operated any business at Montpelier # 4 for over a decade."); *Corning Place*, T.C. Memo. 2024-72, at *37 ("Lacking reliable data, the appraiser would have to rely on a lengthy series of assumptions, estimates, and guesstimates."). Accordingly, "[w]hile the use of the income method . . . is not *a priori* unacceptable for any valuation purpose," it is appropriate to reject it in a particular case if we find it "prone to error and based on too many unverifiable assumptions." *Whitehouse Hotel, Ltd. v. Commissioner*, 755 F.3d at 246–47.

"When the income approach is used, the Court must examine the plausibility of the critical assumptions made by the appraiser." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *44 (citing *Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, 97 T.C.M. (CCH) 1818, 1820). "Each assumption, whether large or small, carries with it 'some risk of error.'" *Id.* (quoting *Whitehouse III*, 139 T.C. at 323). "As interdependent assumptions multiply, the risk of error can increase exponentially." *Id.*; *see also J L Minerals, LLC*, T.C. Memo. 2024-93, at *62.

### i. *Mr. Eidson's Report*

Mr. Barber disavowed his income analysis at trial, ceding the field to Mr. Eidson. Essentially, Mr. Eidson's analysis proceeds as follows.

First, Mr. Eidson largely adopts the site plan prepared by Mr. Pate and the market analysis prepared by Ms. Sward. Based on Mr. Pate's plan, which proposed 816 residential lots and various amenities on the Seabrook property, Mr. Eidson estimates the total cost of developing and building out the property in accordance with the plan (about $33.3 million). Next, based on his own research and Ms. Sward's analysis, Mr. Eidson sets pricing for each type of lot contemplated by Mr. Pate's plan (e.g., $600,000 for marsh view lots, $400,000 for premium lots, etc.). Using these prices and the number of each type of

**[*59]** lot proposed by the Pate plan, he estimates the total gross retail value of the lots over the term of the development (about $197 million). Relying on Ms. Sward's analysis, Mr. Eidson assumes that the lots would sell out over an 11-year period with sales starting in year 2. He estimates a marketing budget of $1.5 million, bringing total costs to approximately $34.8 million. Accounting for selling costs and applying a discount rate of 30%, Mr. Eidson calculates a residual value of $34.84 million and equates this value with the fair market value of the Seabrook property.

ii.     *Analysis*

Considering the record before us, we simply do not believe that a developer or anyone else would have paid almost $35 million (about $95,000 per upland acre) for the Seabrook property in 2017. That Mr. Eidson was able to arrive at such a value reflects numerous problems with the specific inputs Mr. Eidson relied on in his analysis, as well as inherent problems with the DCF method as applied to the vacant land here. We discuss each in turn.

a)     *Number of Lots*

Mr. Eidson bases his analysis on the land plan provided by Mr. Pate, which contemplated that the Seabrook development would include 816 lots of various types and sizes. The lots included marsh view lots, premium lots, custom lots, village lots, farm lots, cottage lots, townhouse units, and loft units. According to the land plan, the Seabrook development would also offer a village with a commercial retail building, a farm stand and vegetable garden, an amenity center with a fitness center and swimming pool, tennis and pickleball courts, bike and nature trails, and a community dock with a kayak launch on Dickinson Creek. All of this, the land plan concluded, would be constructed on the Seabrook property's 370 upland acres. Mr. Eidson conducted no independent evaluation of the feasibility of the plan and incorporated it in full into his analysis.

At trial, it became clear that Mr. Pate's land plan suffered from various problems. Mr. Pate, who did not visit the Seabrook property before preparing the plan, testified that it was really just a concept plan, and that he did not check into local requirements to determine whether the plan was feasible. The plan, for example, could not have been built under the current zoning of the Seabrook property, which would have allowed a maximum of one lot per buildable acre. Further, local

**[\*60]** subdivision rules would have required a second road to be built to access the property. The plan also assumed that the Seabrook property had access to public water and sewer, which it did not. At trial, Mr. Pate admitted that the development would likely require a sewage treatment plant and water wells, which were not included in his plan. He speculated that there would be ample room to build them in the open natural area that he had set aside for biking and hiking trails. This might be so, but we question the viability of building a sewage treatment plant within a natural amenity—one of a small number of features intended to draw high-end buyers to the Seabrook community.[43]

In short, the record establishes that Mr. Pate's land plan could not have been built as envisioned, even if Seabrook had obtained approval for rezoning to PUD. Accordingly, Mr. Eidson's reliance on the number and type of lots reflected in the plan undercuts his DCF analysis.

b)     <em>Lot Prices</em>

Even more problematic are the prices Mr. Eidson sets for the lots. Mr. Eidson relies heavily on Ms. Sward's data for this part of his analysis, as well as his own analysis of the Palmetto Bluff community in Bluffton, South Carolina.

In her report, Ms. Sward collects pricing data from master-planned communities up and down the southeast coast. According to Ms. Sward, she focuses on communities with offerings (and therefore target buyers) similar to those she envisions for the Seabrook community. Ms. Sward analyzes lot and home prices for each community, overall prices, prices by amenity, and prices for nature lots, marsh lots, and deep-water lots. In each category, she selects a target price range for Seabrook lots. At her report's conclusion, Ms. Sward recommends a price for each type of lot Seabrook would offer. Mr. Eidson adopts these prices in his report with some minor adjustments, saying that they are confirmed by his independent analysis of Palmetto Bluff.

This approach might seem reasonable enough at a high level, but a closer look reveals it to be anything but. The core problem is that the communities Ms. Sward and Mr. Eidson focus on are in no way

---

[43] Recall that the much smaller and lower density Yellow Bluff community needed the 40 acres it purchased from Ms. Devendorf in 2006 for a sewage drainage field.

[*61] comparable to the proposed Seabrook community. In general, they are much larger, with desirable locations and luxury amenities to attract buyers. The proposed Seabrook community lacks these attributes.

By way of illustration, Mr. Eidson and Ms. Sward both invoke Palmetto Bluff as a potentially comparable community. Palmetto Bluff is in Bluffton, a city just north of Savannah and adjacent to Hilton Head. Palmetto Bluff is a 20,000-acre development with 4,000 units and 32 miles of waterfront along the May River. Its amenities include, by Ms. Sward's own description, a Jack Nicklaus Signature golf course, a five-star quality resort and spa, boating, canoeing, dining, equestrian facilities, target shooting, trails, pools, fitness facilities, gathering spaces, fishing, tennis, pickleball, and bocce ball. One witness described it as "20,000 acres of the most beautiful piece of property I've ever seen or anybody else has seen." Tr. 1053. And it is closer geographically to both Savannah and Hilton Head than Seabrook is to Savannah.

Mr. Eidson and Ms. Sward both acknowledge that Palmetto Bluff has more amenities and would command higher prices than the Seabrook development. But they still invoke it as a comparable property. Moreover, Mr. Eidson, after initially saying that Seabrook lots should be priced 20% lower than Palmetto Bluff lots, appears to discount Palmetto Bluff prices by only 15% when calculating Seabrook projections. And when one looks at the final prices Mr. Eidson uses in his DCF analysis, one sees that the average price of all Seabrook lots between .21 acres (about 9,000 square feet) and .3 acres (about 13,000 square feet) is $317,678 per lot, significantly *higher* than the Palmetto Bluff average price Mr. Eidson indicates for lots of the same size ($237,423 per lot). More than half of Seabrook's lots (478 of 816) fit into this size category.

Manager might respond that the price difference is due to the Seabrook lots' being marsh front lots or otherwise "premium," while equally sized Palmetto Bluff lots do not have those attributes. (Perhaps because marsh front lots in Palmetto Bluff are larger than .3 acres.) Nevertheless, even excluding marsh front lots and so-called premium lots, Mr. Eidson prices Seabrook's 301 custom lots, which are 9,600 square feet (or .22 acres) and situated away from the marsh and river, at $250,000 per lot. This too is above the Palmetto Bluff average Mr. Eidson lists for lots between .21 and .3 acres. Given the differences between the two communities, higher prices at Seabrook cannot be justified.

[*62]   As a second example, Ms. Sward frequently invokes Kiawah River. When Ms. Sward sets target price ranges for Seabrook's overall lots, marsh lots, nature lots, and deep-water lots, Kiawah River is in each case one of the three or four comparables she relies on. But like Palmetto Bluff, Kiawah River is not comparable to the development proposed for Seabrook.

Kiawah River is a community in South Carolina about 30 minutes south of Charleston. The underlying property is 2,003 acres with 1,168 units planned in two primary villages. The property includes a five-star luxury boutique inn with rooms, branded residences, and amenities. The property is situated on the Kiawah River with river and marsh views, live oak trees, and a 100-acre working farm. The farm includes a goatery that produces goat cheese and milk. There also are nature trails and walking and biking paths throughout the property, a 9,000-square-foot community house with a fitness facility, an outdoor pool complex with a junior Olympic-sized family pool and an adult pool, a full-service kitchen and a shaded bar with poolside dining, a hot tub, pickleball courts, bocce ball, event space, parks, a kayak launch, viewing areas, and a planned commercial village. Kiawah River hosts events featuring nature, recreation, food, and art.

Notably, Kiawah River, which started in 2017, is just up the road from Kiawah Island, which was built out in the 1990s. Kiawah Island is a beachfront country club community with 3,800 homes on 10,000 acres. It has at least three golf courses and has hosted multiple Ryder Cup PGA Championships. Its development brought grocery stores, restaurants, and other amenities to the area long before Kiawah River began. When asked whether Kiawah River benefited from its proximity to Kiawah Island, Ms. Sward said "Actually, no." Tr. 731. She elaborated that Kiawah Island is on the beach and Kiawah River has no beach access, just river access, "and it's three minutes from Kiawah Island."[44] Tr. 731. But she acknowledged that Kiawah River is "not that far" from the ocean and that you can get to the ocean from Kiawah River on a boat. Tr. 754.

To summarize, both Palmetto Bluff and Kiawah River are near well-known and desirable vacation areas. They are large developments with relatively low overall density (less than one residential unit per

---

[44] Ms. Sward later testified that Kiawah River is about 20 minutes from Kiawah Island. The Court takes judicial notice that Kiawah River is approximately eight miles from Kiawah Island and approximately five miles from public beaches.

**[\*63]** acre), river access, miles of waterfront, and numerous amenities including five-star luxury hotels. High-end restaurants, grocery stores, and golf courses are easily accessible nearby.

No such vacation areas or amenities existed near the Seabrook property in 2017, nor do they exist today. As Ms. Sward said herself, there are no nearby beaches, country clubs, golf courses, or high-end hotels or restaurants to draw people to the location. (When asked at trial how many visitors come to Liberty County, Ms. Sward replied: "I would say very few, because there's nothing to offer them to come there." Tr. 779.)

Manager accepts that such vacation areas and amenities do not currently exist near the Seabrook property, or indeed anywhere in Liberty County. But Manager suggests that the Seabrook property itself could become such an amenity, and therefore attract the same kind of buyer that would buy at Kiawah Island or another of Ms. Sward's communities. We are not persuaded.

The Seabrook property has only 370 buildable acres. Because of the property's long, narrow shape, only a modest portion of that area is marsh front, and an even smaller portion has direct creek access. Indeed, a significant percentage of the marshland on the property (about 213 acres, or 80% of the total marshland) is on the east side of Dickinson Creek and would be generally inaccessible to residents of the hypothetical Seabrook development. There is no beach or river frontage, and Ms. Sward testified that residents likely could not even navigate from Dickinson creek to a river at low tide.

Seabrook's conceptual plan for the property squeezes 816 units and all its amenities into its small buildable area. Marsh front and premium nature lots generally are smaller than those at communities Ms. Sward viewed as comparable, and other lots are smaller still. As a result, the Seabrook property has far higher density than Kiawah River, Palmetto Bluff, and most other communities on which Ms. Sward focuses.[45] Given the limited water access on the property, the proposed

---

[45] According to Ms. Sward, for example, Ford Field & River has 400 units on lots that range in size from .5 to 5 acres, while the Landings has 4,085 units on 6,300 acres.

Manager might protest that we are comparing apples to oranges, since for the Seabrook property we focus on the buildable area whereas Ms. Sward focuses on the total acreage of other developments. But our density point would hold even if we

**[*64]** density would appear to require more than an estimated 2,200 people to share a single dock. Additionally, while the other amenities proposed for the Seabrook development might enhance its appeal (walking trails, fitness center, pool, vegetable patch, coffee shop, etc.), they would not put it on the map as a high-end destination for vacationers and second home buyers.

In short, while a development along the lines Ms. Sward envisions may or may not have been possible on the Seabrook property, it would not have been another Palmetto Bluff or Kiawah River.[46] Thus, we find the prices Mr. Eidson relies on for his DCF analysis to be wholly unreliable.

c)      *Absorption Rate*

Also critical to Mr. Eidson's analysis is his conclusion that the proposed Seabrook development would sell out within 11 years, with sales starting in year 2 of the project. This conclusion assumes that, after the first year, the Seabrook development would sell approximately 80 lots per year. Mr. Eidson again bases his conclusion largely on Ms. Sward's analysis, noting that her conclusions align with his own primary research and market experience.

Ms. Sward estimates the demand for Seabrook's lots by considering three primary sources of residential demand for vacation and second homes: (1) visitors to the area, (2) second home buyers in the region who move, and (3) households moving to the area that buy a vacation or second home. Ms. Sward uses various publicly available statistics to calculate the number of annual sales Seabrook could make to each group. But calculations mean nothing if the underlying assumptions are faulty. And, at trial, Ms. Sward admitted that she made numerous problematic assumptions.

---

looked at the Seabrook property's overall acreage. And Manager has presented no evidence that any of the other properties have similar layouts to the Seabrook property, where a large continuous area of the property is undevelopable and inaccessible to the rest of the property.

[46] We focus on these two examples, but the same issues exist with the other communities the experts discuss. Ms. Sward said, for example, that East Beach is on the beach in St. Simons Island, a high-end vacation community, and also has marsh access. She admitted that Ford Field & River is much closer to Savannah in Richmond Hill and has golf, marsh, and river access. Similarly, she confirmed that the Landings is on Skidaway Island in Savannah and has a golf course, river access, and ocean access. And so on.

**[*65]** Take, for example, Ms. Sward's calculation of demand from visitors to the area. Essentially, Ms. Sward took the number of annual home sales in Savannah for 2016 to 2017 and divided that number by the number of visitors to the Savannah area for 2015 to calculate a "conversion ratio." This, Ms. Sward says, shows the percentage of visitors to Savannah that can be expected to buy a new home each year. But she offers no support for this assumption, nor does she attempt to establish any correlation between the two numbers. When pressed at trial, Ms. Sward eventually admitted that she just came up with a ratio because she needed one, and that there might not be any correlation at all. This fault alone would be fatal to Ms. Sward's analysis. But it is far from the only one.

As another example, take the very next step in Ms. Sward's computations. She applies her conversion ratio calculated at the previous step to a projected 3% annual increase in visitors to the Savannah area to determine that there will be 187 new home sales to such visitors each year going forward. She then assumes, without providing support, that Seabrook would capture 15% to 20% of those sales each year. Such an assumption would strain credulity even if Seabrook were in Savannah. Given Seabrook's actual location 45 minutes away in an undeveloped area, it enters the realm of fantasy.

We find similar issues with Ms. Sward's calculation of the remaining two sources of residential demand, but we do not detail them here. We note in closing, however, that data from Liberty County provides a reality check on Ms. Sward's calculations. Specifically, the closest two developments to the Seabrook property are Yellow Bluff and Hampton Island. Both are east of I–95 and both have water access; Yellow Bluff has its own marina, and Hampton Island consists of a series of salt marsh islands connected to the mainland by a bridge. Both started development before the recession, with Hampton Island targeting a higher price point than the Seabrook development and Yellow Bluff targeting a lower price point. While active, both sold about 10 lots per year, a far cry from the 80 lots per year predicted for the Seabrook property. Yellow Bluff was still selling lots in 2017. And Hampton Island failed and went dormant in 2007.

To summarize, we find the absorption estimates that Ms. Sward prepared and Mr. Eidson relies on to be wholly unreliable. We reject Mr. Eidson's DCF analysis on this basis as well.

**[*66]**                                             d)    *Costs*

As a final point, the Commissioner has highlighted various costs that Mr. Eidson does not factor in when conducting his DCF analysis. For example, Ms. Sward testified that marketing the Seabrook development would require $1 million per year for six years. Mr. Eidson, however, assumes marketing costs of only $1.5 million total. He acknowledged at trial that Ms. Sward was the authority on marketing budgets.

Neither does Mr. Eidson's report account for the cost of the second road that would be required under local subdivision regulations. Moreover, while he obtained estimates for the costs of installing water and sewer systems on the property, he did not follow up on various issues raised by the estimates. For example, the estimate Mr. Eidson obtained for a sewer system said it was conditioned on the property's being 1,400 feet above sea level. No part of the Seabrook property is more than 100 feet above sea level, and parts of it are at sea level. No soil analysis was provided in the course of generating the estimate, and the estimate does not account for any indemnity insurance that would be required. Similarly, with regard to water, Mr. Eidson obtained an estimate for the cost of installing a well, but did no research to see whether the water table on the Seabrook property would support a well for the anticipated number of people. Nor did he research required approvals or consider water quality in the area. As another example, Mr. Eidson's analysis budgets only $100,040 for erosion control, but Mr. Eidson admitted at trial that the property is ecologically sensitive and that in developing it there would be "huge potential for runoff into Dickinson Creek." Tr. 963.

In short, the record leaves ample room to doubt the costs in Mr. Eidson's DCF analysis.

iii.    *Conclusion*

Our Court has recently discussed the difficulties of applying the income method to value vacant land. *See, e.g.*, *J L Minerals, LLC*, T.C. Memo. 2024-93, at *61–65. We fully agree with that discussion, in which the Court explained that a DCF analysis geared to what a business can earn is of limited utility in determining what a property is worth. *Id.* at *63. Moreover, even assuming that the income method can be usefully applied to vacant land with quality inputs, *cf. Whitehouse Hotel, Ltd. v. Commissioner*, 755 F.3d at 246–47, we explained that a DCF analysis

**[\*67]** loses its utility when such inputs are lacking, *see J L Minerals, LLC*, T.C. Memo. 2024-93, at \*64–65 ("Use of the discounted cashflow method with so few reliable inputs and so many variables and unknowns is simply an exercise in imagination."). As the discussion above shows, reliable inputs clearly were lacking here. We therefore give no weight to Mr. Eidson's DCF analysis.

c. *Actual Transactions Involving the Seabrook Property*

In November 2017, just one month before Seabrook contributed its conservation easement, Ms. Belford contributed the Seabrook property to Seabrook in exchange for a 99% interest in Seabrook. One month later and just a few days before the easement was contributed, Ms. Belford sold a 97% interest in Seabrook to InvestCo for $4.74 million. This transaction between unrelated parties valued the Seabrook property at $7,670 per acre, or $13,204 per upland acre.[47] We find this value relevant, consistent with past holdings of both the Eleventh Circuit and our Court. *See, e.g.*, *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1371 (describing an arm's-length sale of property just 17 days before a conservation easement was placed on the property as an "overwhelmingly significant fact" in determining its before use value); *Buckelew Farm*, T.C. Memo. 2024-52, at \*56.

Manager acknowledges the relevant authorities, but challenges the arm's-length nature of Ms. Belford's sale to InvestCo. Specifically, Manager says, Ms. Belford was willing to accept a below-market price for her interest in Seabrook because she wanted to increase the chances that the Seabrook property would be conserved rather than developed. Manager alleges that the price to InvestCo was set by Mr. Kiene, not negotiated by Ms. Belford, and that it did not reflect the fair market value of the property. According to Manager, every witness who had first-hand knowledge of the sale testified that it was not at arm's length.

We are not convinced. We accept that such factors may have *modestly* decreased the price Ms. Belford was willing to accept for her

---

[47] We compute these values by adjusting the $4.74 million that Ms. Belford received for a 97% interest in Seabrook up to $4,886,598, approximating what would have been paid for a 100% interest in Seabrook ($4.74 million / .97% = $4,886,598). We then subtract $1,000 to eliminate the value attributable to the receivable from Manager and divide the resulting amount ($4,885,598) by the respective acreages (637 total acres and 370 acres of upland). For simplicity, the upland calculation attributes no value to the marsh.

[*68] interest in Seabrook. As we will discuss, however, we are not persuaded that the amount Ms. Belford received was significantly less than the fair market value of her proportionate interest in the underlying property. And it certainly was not seven times less, as Manager would have us believe.

i. *Ms. Belford's Testimony*

a) *Financial Circumstances*

To be sure, Ms. Belford credibly testified at trial that her ultimate goal was always conservation and that she viewed $4.74 million as a reasonable price in light of that goal. But other aspects of her testimony were revealing. To begin, Ms. Belford testified about the difficulties of maintaining such a large landholding over time and the Devendorfs' need for cash. She described "essentially living off of a credit line" over a period of years, Tr. 116, as well as hosting weddings and giving kayak tours on her property to keep her employees employed and her taxes paid. The financial crisis exacerbated these issues; and, in its aftermath between 2010 and 2015, the Devendorfs did not want to sell any more property because they were "wait[ing] for the bear" "to time the market properly." Tr. 115.

We found Ms. Belford credible on these points, and we also found her credible when she discussed the financial importance of the easement transactions for her and her mother. Ms. Belford said:

> [I]t's like this is the chance. This was the one chance we had, not to over value it, but to value it properly, because once you give it up it's gone. And this was our asset. This is our one asset.

Tr. 121. In other words, the easement transactions were the Devendorfs' only chance to monetize the Devendorf property, their one asset. So, while Ms. Belford may have been willing to part with the Seabrook property for a what she perceived to be a modest discount (a point we discuss further below), we simply do not believe that Ms. Belford was unconcerned with extracting the full value of the property as Manager claims.[48] Ms. Belford testified that she was satisfied with the amount

---

[48] According to Manager, Ms. Belford was willing to part with her interest in the Seabrook property for approximately 13% of its fair market value ($4,885,598 / $37,000,000 = 13%). Given the record before us, including Ms. Belford's testimony, we do not find this assertion credible.

[*69] she received for the Seabrook property.  And Manager has not shown that Ms. Belford was anything other than a willing seller who was aware of the relevant facts and not under compulsion to sell.[49]  *See* Treas. Reg. § 1.170A-1(c)(2) (defining fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts").

Notably, Ms. Belford engaged in a second easement transaction in 2017, for a property just north of the Seabrook property. That property (the Big Sky property) was also in Liberty County and spanned 654 acres, with 295 acres of upland and 359 acres of marsh and river. Ms. Belford received $3.78 million for her participation in the transaction, in which she sold a 97% interest in an entity to which she had contributed the Big Sky property.  Once again, the price Ms. Belford received worked out to approximately $13,206 per upland acre, nearly identical to what she received in the Seabrook transaction.[50]  The matching prices strike us as unlikely to be a coincidence.  And it means that Ms. Belford was willing to accept that per-acre price for approximately 13.5% of her family's total landholding ((637 Seabrook acres + 654 Big Sky acres) / 9,600 total acres).

b)      *Estimates of Overall Value*

When Ms. Belford testified about the value of the Devendorf property overall, she estimated that the property was worth $200 to $400 million before the recession.  Applied across the entire 9,600 acres, that estimate works out to approximately $20,833 to $41,667 per acre, significantly in excess of what Ms. Belford received for her interest in Seabrook.  But we do not find her testimony persuasive on this point, for several reasons.

---

[49] Manager argues that Ms. Belford did not negotiate the price.  We take that to mean that Ms. Belford did not haggle back and forth with InvestCo.  But she accepted the offer that was presented to her.  That she found it unnecessary to make a counteroffer does not mean the sale was not at arm's length.

[50] We compute this value by adjusting the $3.78 million that Ms. Belford received for her 97% interest up to $3,896,907, approximating what would have been paid for a 100% interest in the entity ($3.78 million / .97% = $3,896,907).  We then subtract $1,000 to eliminate the value attributable to a capital contribution from the manager in that transaction and divide the resulting amount by 295 upland acres, yielding $13,206 per acre.

**[*70]**                                                    i)   *Pre-Recession Offers and Sales*

First, in providing the estimate, Ms. Belford generally relied on pre-recession sales, or else pre-recession offers she or her mother had received for smaller lots, often accompanied by extenuating circumstances that would have allowed the Devendorfs to extract a premium for the property at issue. *See* Tr. 112 (alluding to her prior testimony and estimating the value of the Devendorf property "at th[o]se prices"). For example, Ms. Belford frequently invoked her mother's sale of 40 acres to Yellow Bluff in 2006 for $55,000 per acre. But that sale occurred before the recession, at the height of the real estate boom. And, significantly, Yellow Bluff needed the parcel, which at 40 acres was much smaller than the Seabrook property, to serve as a septic drain for its development because "they did not have enough room." Tr. 84. Ms. Devendorf therefore had significant leverage in the Yellow Bluff sale that would not be present in a hypothetical sale of the Seabrook property.

Similarly, Ms. Belford testified that sometime between 1997 and 2000, she was offered $100,000 to $150,000 per acre to sell a small plot of land for a cell phone tower. The buyer in that instance needed the plot (just three acres or so) in a specific location for a specific purpose, giving Ms. Belford leverage. And the buyer ultimately purchased the land from Ms. Belford's neighbor, underscoring the importance of the location. These circumstances do not translate to a hypothetical sale of the Seabrook property.

As a final example, Ms. Belford testified that, in 2004, the prior owner of the land underlying the Hampton Island Preserve offered Ms. Devendorf $11 million for 250 acres of land ($44,000 per acre), as long as it had "a little bit of waterfront." Tr. 111. According to Ms. Belford, Ms. Devendorf declined the offer and discussions never progressed further. Once again, even if we were to attribute perfect accuracy to this second-hand recollection, the offer was made near the height of the development boom that preceded the recession. We question whether this individual would have made the same offer in 2017, particularly given what became of Hampton Island Preserve. Further, this offer was not specific to the Seabrook property. Moreover, in 2006, not long after the prior owner of Hampton Island Preserve reportedly made this offer, Hampton Island, LLC, sold 85.314 acres of vacant woodland contiguous with Hampton Island Preserve in Liberty County for just $1.35 million, or $15,824 per acre. *See Brooks v.*

[*71] *Commissioner*, 109 F.4th 205, 208 (4th Cir. 2024), *aff'g* T.C. Memo. 2022-122.[51]

### ii)  *No Change in Value*

Second, after estimating the value of the Devendorf property "at these prices,"—i.e., pre-recession prices—Ms. Belford testified that she did not think the property had decreased in value after the recession. She said that although "there was a lack of credit available to people to buy property, . . . [the] value was still there."  Tr. 112.

While we understand Ms. Belford's belief that the intrinsic value of her land did not change after the recession, the land's fair market value—i.e., the price at which it would change hands between a willing buyer and a willing seller—most certainly did change.  Ms. Belford said as much herself, when she acknowledged that she and her mother did not want to sell any land in the years after the recession because they wanted to "wait for the bear."  That is, they wanted to time the market correctly.

In a stark illustration of this point, Ms. Belford testified that, in 2007, the "Glebe" property, a PUD-zoned parcel directly north of her North Newport property on the other side of Highway 84, sold for $29,000 per acre.  The handwritten notes Seabrook offered for corroboration state that the Glebe property was 378 acres and sold for $11 million, or $29,100 per acre.  Manager highlights this sale in its brief as some of the record's "most notable . . . valuation information."  Pet'r's Op. Br. 184.

We find Manager's reliance on this sale curious because it appears to involve a nearly identical parcel to the one that underlies the first comparable sale (comparable 1) proposed in Mr. Barber's expert report.  That sale too involved a parcel of approximately 378 acres (379.76 acres, to be precise), known as the Glebe Martin Plantation, just north of North Newport on the other side of highway 84.  The sale took place on September 30, 2016, at a price of $1.75 million, or $4,608 per acre.  This amounts to approximately 16% of the 2007 price that

---

[51] These examples are simply illustrative.  In its brief, Manager invokes other old sales and offers, citing Ms. Belford's trial testimony.  But Ms. Belford offered few details regarding the transactions she recalled, and Manager provided little in the way of corroborating information.  In any event, none of the transactions Manager cites were sufficiently close in time to the donation of the easement to carry significant weight.

[*72] Ms. Belford recalled. So either Ms. Belford's recollection was incorrect, or else the value of the Glebe property dropped significantly between 2007 and 2016.[52]

In short, whatever its probative value might have been for valuing the Devendorf property before the recession, we do not view Ms. Belford's estimate of $200 to $400 million to be a useful indicator of the property's value after the recession.

### iii) *Upland Versus Marsh*

Third, Ms. Belford's testimony raised an issue that both parties touched on at various points in their briefing. Specifically, when she estimated the value of the Devendorf property before the recession, Ms. Belford focused exclusively on the upland acres, attributing no value to the marsh. Tr. 112 ("[W]e've got about 8,000 acres of upland, all of it would have been worth at least [$]200 million, anywhere up to $400 million at these prices.").[53] This focus is consistent with the Weibel appraisal's methodology and statements in the other appraisals related to the 2015 and 2016 easement transactions, which generally included wording along the following lines: "In Coastal Georgia properties like the subject, the applicable unit of comparison is typically the uplands contained within the tract or the area suitable for development although both gross and upland acreage are provided." Ex. 164-J, p. 85. It is also consistent with the prior offers and sales Ms. Belford invoked as support for her estimate, none of which appears to have been for marsh. And it makes sense given Ms. Belford's expressed view that the most lucrative use of her property would be to sell it for development. Marshland, of course, cannot be developed.

The upland versus marshland distinction may have had less salience for the Devendorf property overall, because only about 1,200 of its total 9,600 acres, 12.5%, were marsh. But nearly half of the Seabrook

---

[52] In challenging Mr. Barber's report, Manager argues that comparable 1 was not sold at fair market value because it was an auction sale. But as we have discussed, we accept Mr. Barber's explanation that "[i]nterviews with local brokers and appraisers confirmed that adequate market exposure and advertising were more than enough to support as fair market value." Ex. 200-R, p. 122.

[53] We note that, earlier in her testimony, Ms. Belford explained that the precise number of upland acres was 8,400. She appears to have used 8,000 as an approximation for purposes of estimating value.

[*73] property, about 42%, is marsh. So the difference in value between the two types of land is highly relevant to the case before us.

Examining this distinction more closely calls into question Ms. Belford's testimony about the value of the Seabrook property, even if we assumed only for the sake of argument that her pre-recession estimates were accurate and remained accurate in 2017. For example, Ms. Belford's estimate of $200 to $400 million for 8,000 upland acres yields a range of $25,000 to $50,000 per upland acre.[54] Applying that range to the 370 upland acres on the Seabrook property produces a value between $9.25 million and $18.5 million. These values are significantly greater than the $4.74 million that Ms. Belford received for her 97% interest in Seabrook. But they also are well below—50% to 75% below, to be precise—the Seabrook property's appraised value of $37 million (resulting in an easement value of $35 million), which Ms. Belford testified she thought was accurate.[55] In short, Ms. Belford's numbers do not add up.

### c)    *Conclusion*

In light of these issues, Ms. Belford's testimony does not persuade us that the value of the Seabrook property in 2017 was significantly greater than the price she received for selling 97% of Seabrook. We therefore view that amount as relevant for determining the before value of the Seabrook property.

### ii.    *Mr. Kiene's Testimony*

The testimony of Mr. Kiene, Manager's other witness regarding the $4.74 million price, was similarly revealing. To begin, we note that we did not find Mr. Kiene entirely credible, particularly given his vested

---

[54] Like Ms. Belford, we attribute no value to the marsh in this example. We also note that, using the more precise number of upland acres (8,400) produces a range of $23,810 to $47,619 per acre.

[55] Just to emphasize the point, when considered on a per-upland-acre basis, the Seabrook property's appraised value of $37 million equates to $100,000 per acre. This is the same per-acre value that Mr. Weibel reached in preparing his analysis, attributing no value to the marsh. Ms. Belford testified that she thought the appraisal was accurate, citing the land's aesthetic value and the examples she had provided in her testimony. But, except for the cell tower offer, which was for a comparatively tiny three-acre parcel, none of the sales or offers she remembers comes close to supporting a value of $100,000 per upland acre, even before the recession. And in Ms. Belford's own analysis of the Devendorf property, she too placed all the value on the upland, and none on the marsh.

[*74] interest in this transaction and the many others he facilitated. But we pause on a few comments he made.

First, Mr. Kiene acknowledged that in 2017, Liberty County was "still suffering the effects of the housing collapse" and that the "real estate market was still depressed." Tr. 520. As a result, he said, "it would have been essentially impossible" to market the Seabrook property for sale at the value Seabrook claimed. *Id.* "*In real life*," Mr. Kiene elaborated, "[Seabrook] would not [have] been able to do that." *Id.* (emphasis added).

Second, Mr. Kiene said the following regarding the price Ms. Belford received for the Seabrook property:

> Generally, we paid [Ms. Belford] about 50 to 60 percent of the amount of the rise, and that actually worked out in most cases to equate the current use value of the property as agricultural; it was very close to farm land, inland, so it was a good way for us to establish some method for determining a reasonable payment.

Tr. 456. Mr. Kiene did not elaborate on how the precise percentage was chosen, but we note again the nearly identical price per upland acre that Ms. Belford received for the Big Sky and Seabrook transactions. Additionally, Mr. Kiene suggests that the prices paid to Ms. Belford generally were reflective of prices paid for other land in Liberty County, albeit agricultural land that was further inland. We find this comment interesting because, most of the post-recession land sales from Liberty County in the record, particularly sales of raw land inland, reflect significantly lower values than the per-acre amounts Ms. Belford received for the Seabrook and Big Sky properties.

### iii. *Alleged Lack of Comparable Sales*

Finally, Manager also argues that, unlike the circumstances in *TOT Property Holdings*, the $4.74 million sale price is not aligned with the comparable sales analyses the parties offered. Thus, Manager says, because no comparables suggest a similar value, the price Ms. Belford received from InvestCo is unreliable.

But Manager's argument is based on an erroneous premise. Manager is mistaken that no comparable suggests a similar value. As we have explained, three of Mr. Barber's comparables do, when adjusted

**[\*75]** in accordance with Mr. Eidson's methodology for year of sale, location, and water access.

Furthermore, that many of the comparables offered by the parties' experts are unhelpful does not suggest that we should ignore an arm's-length transaction related to the Seabrook property mere days before the easement contribution. In fact, the relative scarcity of quality comparables cuts in the opposite direction, rendering the arm's-length transaction even more pertinent.

We turn next to reconciling the sale prices of the three adjusted comparables and the $4.74 million Ms. Belford received to reach our valuation conclusion.

3.     *Valuation Conclusion*

The parties agree that the easement should be valued by calculating the difference between the fair market value of the Seabrook property before and after Seabrook granted the easement.

In determining the before value of the Seabrook property, we view the most relevant information to be the adjusted prices from Mr. Barber's comparables 1, 2, and 3 ($7,002, $6,865, and $10,134 per acre, respectively), as well as the price Ms. Belford received from InvestCo ($7,670 per acre).

As we have said, the Seabrook property was beautiful, with rare natural features that enhanced its value. For the area, its upland acreage had relatively low flood risk. We also are willing to credit, to a limited extent, Ms. Belford's testimony that she accepted what she believed was a discounted price for the property to increase the chances it would be conserved.[56] Weighing these data points and the full record before us, we select a per-acre value of $9,000, at the higher end of the range.[57] We therefore determine that the before value of the Seabrook property was $5,733,000 (637 acres multiplied by $9,000 per acre).

---

[56] Certain other factors, such as control and marketability discounts, also could result in a lower price paid for an interest in an LLC (here, Ms. Belford's interest in Seabrook) than would be paid for a direct interest in the assets held by the LLC (here, the Seabrook property). Neither party presented arguments regarding control and marketability discounts, however, and so they have forfeited those arguments.

[57] Our conclusion in this regard would not change if we had eliminated comparable 1 from consideration because it was an auction sale.

**[\*76]** In determining the "after value" of the Seabrook property, we observe that the "after value" determined by Mr. Barber, $1,015,000, is lower than (and thus more advantageous to Manager than) the "after value" determined by Mr. Eidson. We will therefore deem the Commissioner to have conceded that the "after value" of the Seabrook property was $1,015,000.

The value of the conservation easement was thus $4,718,000 ($5,733,000 − $1,015,000).

## IV.  *Penalties*

The Code imposes a penalty for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." I.R.C. § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. I.R.C. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." I.R.C. § 6662(h). A misstatement is "gross" if the value of property claimed on the return is 200% or more of the correct amount. I.R.C. § 6662(h)(2)(A)(i).

We have determined that the correct value of the easement at yearend 2017 was no greater than $4,718,000. Double that amount is $9,436,000. The value Seabrook claimed for the easement on its return was far in excess of $9,436,000.[58] The valuation misstatement was thus "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." I.R.C. § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* I.R.C. § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* I.R.C. § 6664(c)(3) (first sentence); *see also Chandler v. Commissioner*, 142 T.C. 279, 293 (2014) ("The [Pension Protection Act of 2006, Pub. L. No. 109-280, 120

---

[58] As already discussed, the Form 8283 attached to Seabrook's 2017 Form 1065 reported a fair market value of the conservation easement of $35,850,000 and also reflected a "conservation easement reserve" of $3,268,557. Seabrook claimed a noncash charitable contribution deduction of $32,581,443, i.e., $35,850,000 less $3,268,557. We need not decide here whether the "value" Seabrook claimed on its return for purposes of applying section 6662(h) is $35,850,000 or $32,581,443, as either amount far exceeds the statutory threshold for the gross valuation misstatement penalty.

[*77] Stat. 780] . . . eliminated the reasonable cause exception for gross valuation misstatements of charitable contribution property."). The 40% penalty thus applies to the portion of the underpayment attributable to claiming a value for the easement in excess of $4,718,000.[59] *See Jackson Crossroads, LLC*, T.C. Memo. 2024-111, at *48; *Oconee Landing*, T.C. Memo. 2024-25, at *75.

The Commissioner alternatively seeks a 20% penalty for (among other things) a substantial understatement of income tax. *See* I.R.C. § 6662(a), (b)(2). This penalty would apply to what might be called any "lower tranche" of the underpayment, i.e., the portion of any underpayment that was not attributable to a valuation misstatement. *See Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, at *2. Because we hold Seabrook is entitled to a deduction for the correct value of the conservation easement, there is no underpayment not attributable to a valuation misstatement, and we need not address the alternative penalties.[60]

We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

---

[59] The parties have stipulated that a revenue agent made the initial determination to assert penalties against Seabrook, and that the determination was approved, in writing, before the revenue agent communicated the penalties to Seabrook. Manager acknowledges that, under our precedents, this is sufficient to satisfy the requirements of section 6751(b). However, to preserve its position on appeal, Manager contends that the Commissioner has not demonstrated compliance with section 6751(b) because he has failed to show that the revenue agent's immediate supervisor meaningfully reviewed the penalty determination. We have rejected this argument before and reject it again here. *See, e.g.*, *Belair Woods, LLC v. Commissioner*, 154 T.C. 1, 17 (2020).

[60] "The maximum accuracy-related penalty imposed on a portion of an underpayment may not exceed 20 percent . . . (40 percent of the portion attributable to a gross valuation misstatement), notwithstanding that such portion is attributable to more than one of the types of misconduct described in paragraph (a) of this section." Treas. Reg. § 1.6662-2(c). The Court has jurisdiction to determine partnership items and the applicability of any penalty that relates to an adjustment to a partnership item. I.R.C. §§ 6221, 6226; *United States v. Woods*, 571 U.S. 31, 39–42 (2013). Although nothing limits our ability to determine the applicability of more than one accuracy-related penalty at the partnership level, *Oconee Landing*, T.C. Memo. 2024-73, at *3–4, *supplementing* T.C. Memo. 2024-25, we need not do so here.

**[\*78]**  To reflect the foregoing,

*Decision will be entered under Rule 155.*